LEXSEE

**ALFRED KETTERMAN, Plaintiff(s), - against - THE CITY OF NEW YORK, CORRECTIONS OFFICER DOUG SIMPSON (Shield No.12728), DIRECTOR OF SECURITY CAPTAIN "JOHN" BAILEY, WILLIAM FRASER, WARDEN OF THE J.A.T.C. and CORRECTIONS OFFICERS JOHN DOES 1-2 in the individual and official capacities as Corrections Officers employed by the City of New York, Defendant(s).**

**00 Civ. 1678 (NRB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2001 U.S. Dist. LEXIS 6979**

**May 29, 2001, Decided
May 30, 2001, Filed**

**DISPOSITION:**    [*1] Defendants' motion for judgment on pleadings granted. Plaintiff's amended complaint dismissed.

**COUNSEL:** For ALFRED KETTERMAN, plaintiff: Andrew F. Plasse, New York, NY.

For THE CITY OF NEW YORK, DOUG SIMPSON, "JOHN" BAILEY, WILLIAM FRASER, defendants: Brett H. Klein, Michael D. Hess, Corporation Counsel, City of New York, New York, NY.

**JUDGES:** NAOMI REICE BUCHWALD, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** NAOMI REICE BUCHWALD

**OPINION**

**MEMORANDUM AND ORDER**

**NAOMI REICE BUCHWALD**

**UNITED STATES DISTRICT JUDGE**

Plaintiff Alfred Ketterman, who was incarcerated at the Rikers Island Correctional Facility pending trial, brings this action against the defendants pursuant to 42 U.S.C. §§ 1981 and 1983 for damages relating to a March 7, 1997 assault by other inmates at the prison. Currently before the Court are defendants' motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) or, in the alternative for summary judgment pursu-

ant to Fed. R. Civ. P. 56, and plaintiff's cross-motion for leave to amend his complaint pursuant to Fed. R. Civ. P. 15. For the reasons that follow, defendants' motion to dismiss is granted.

**BACKGROUND**

The present case [*2] arises out of the following incident. On March 7, 1997, plaintiff, who had been placed in the general population on Rikers Island while awaiting trial, was returning to his cell block from a visit to the prison's law library when he was assaulted by unknown inmates. Specifically, plaintiff was stabbed four times in the back with an ice pick and punched in the face, ribs, back and legs.

**A. Allegations of the Original Complaint**

Plaintiff's original complaint, which was filed on the eve of the expiration of the statute of limitations, was grounded in a theory of misclassification. Plaintiff alleged that, although he had undergone a routine security classification, did not pose a threat to other inmates, had no prior disciplinary history, was not a gang member, and was awaiting trial on a non-violent crime, he was nevertheless erroneously placed in a "high security" classification area within the general population, in which gang members including Latin Kings and Bloods were also present. Compl. PP 13, 17-18, 21.

Plaintiff alleged that his unidentified assailants were Bloods, Compl. PP 15-16, 22 and that at the time of the assault, there was a great deal of racial tension [*3] in plaintiff's cell block between the Bloods and the Latin Kings, of which the defendants were aware. Compl. P

21. Plaintiff further alleged that the Bloods in question had numerous prior disciplinary infractions including weapon possession and assault infractions and that as a result, the defendants should not have placed them in the same security classification area with the plaintiff. Compl. P 16, 18. Plaintiff also alleged that defendants were aware he was not a gang member. Compl. P 21.

The second theory contained in plaintiff's original complaint was that defendants Simpson and the two "John Does" were the corrections officers on duty at plaintiff's cell block, that these defendants were not at their posts at the time of the alleged assault, and that they failed to intervene or stop the assault when it occurred, and failed to provide adequate protection for the plaintiff. Compl. PP 22-23, 27.

Based on the events of March 7, 1997 and the misclassification and failure to protect theories discussed above, plaintiff's complaint made a number of conclusory allegations. Specifically, plaintiff's complaint alleged that in failing to remain on post and protect the plaintiff, the named [*4] corrections officers acted with actual malice and with willful, deliberate and wanton indifference to, and deliberate disregard for, plaintiff's rights. Compl. P 28. Similarly, plaintiff's complaint alleged that defendants Bailey, Chief of Security at Rikers, and Fraser, the Warden at Rikers, were deliberately indifferent to plaintiff's safety, Compl. P 29, and that the defendants' failure to adequately protect him gave rise to causes of action for violation of plaintiff's civil rights, and for negligence. Compl. PP 30-31, 33-34. Finally, plaintiff's complaint alleged that the City of New York "had a custom and practice of failing to protect individual inmates [at Rikers] through deliberate indifference." Compl. PP 36-41.

**B. Subsequent History**

After receiving defendants' counsel's July 21, 2000 letter suggesting that a motion to dismiss would be appropriate, we held a conference on August 3, 2000, to discuss the adequacy of plaintiff's complaint and the proposed motion. In the July 21 letter, defendants' counsel had argued that plaintiff could not sustain his burden of showing the defendants actually knew, or had reason to know that there was a substantial risk of harm [*5] to the plaintiff. Defs.' letter of July 21, 2001 (citing *Bryant v. Maffucci*, 923 F.2d 979, 985 (2d Cir. 1991), *cert. denied* 502 U.S. 849, 116 L. Ed. 2d 117, 112 S. Ct. 152 (1991); *Candelaria v. Coughlin*, 1997 U.S. Dist. LEXIS 4513, 1997 WL 171256 (S.D.N.Y. 1997); *Smiley v. Westby*, 1994 U.S. Dist. LEXIS 13413, 1994 WL 519973 (S.D.N.Y. 1994)).

In response to our questions, plaintiff's counsel clarified that plaintiff was claiming deliberate indifference because the alleged gang members should not have been placed in the same area with him, and not that he was placed there in error. Moreover, the Court raised the issue of whether the then-recently decided case of *Rangolan v. County of Nassau*, 217 F.3d 77 (2d Cir. 2000) suggested that the Eighth Amendment deliberate indifference standard could not be met on the facts alleged by the complaint. To further explore the allegations in the complaint prior to motion practice, we suggested that the defendants file an answer and the parties engage in discovery concerning the incident.

The discovery conducted, which included the report of the prison's investigation of the March 7 incident and plaintiff's criminal record, did not substantiate, and indeed [*6] refuted, many of the allegations in plaintiff's original complaint. As for the allegations of misclassification, the discovery showed that all the suspected participants in the March 7, 1997 assault were properly classified within the prison's general population. Specifically, at a subsequent conference on September 15, 2000, counsel informed the Court that plaintiff had been properly classified as a "high medium" security inmate and that all four individuals identified by prison officials as the likely assailants were properly classified as well.

Subsequently, plaintiff's counsel was afforded the opportunity for further discovery into the incident and was provided with photographs of the suspected assailants based on the incident report. However, plaintiff was unable to identify any of his assailants from the photographs. There was no evidence that plaintiff had identified, at the time of the incident or the investigation, any inmate as one of his assailants. In a further effort to identify plaintiff's unnamed assailants, discovery was conducted to determine if it was possible to reconstruct from the prison's paper or electronic records which inmates were in plaintiff's cell block [*7] on the date of the assault. Such reconstruction was not possible. While Rikers maintains records that identify the prisoners in its custody by name, those records do not contain sufficient information to permit the identification of the inmates in plaintiff's cellblock on the day of the assault because only headcounts, rather than names, are recorded during the course of the day as inmates move from one area of the prison to another. While we refused to order the defendants to prepare a photo array of every inmate in the entire prison population who had passed through Rikers on the date in question, plaintiff's counsel concedes that he never indicated any additional discovery was needed before defendants made their motion, and further that he had not been sandbagged by defendants' motion when it was made. April 19, 2001 Oral Argument Transcript ("Tr."), pp. 11-12.

To recap, following discovery it became clear that the plaintiff and the suspected assailants did belong in

the same housing population and that in the absence of a specific threat to the plaintiff or to some subgroup of inmates of which plaintiff was a part, the allegations of a failure to protect the plaintiff did not [*8] rise above a non-actionable claim for negligence. Thus, we asked plaintiff's counsel, during a phone conference on October 23, 2000, if he could amend the complaint to cure the defects therein and state a claim consistent with his obligations under Fed. R. Civ. P. 11. After he had an opportunity to consider an amendment to the complaint, plaintiff's counsel indicated to the Court that he would not be able to amend the complaint during phone conferences on November 6 and 14, 2000. Specifically, on November 6, plaintiff's counsel conceded that the complaint, as drafted, failed to state facts from which a trier of fact could infer notice of a substantial risk of harm to the plaintiff, that he did not think he could file an amended complaint consistent with his professional obligations, and that he would prefer instead to file a stipulation of discontinuance if his client would consent. On November 14, plaintiff's counsel informed the Court that his client would not consent to withdrawing his complaint. He further stated that he could not file an amended complaint consistent with his professional obligations and that he would prefer to withdraw as counsel of record. The Court suggested [*9] that if plaintiff's counsel sought to be relieved he could file a cross-motion to that effect in response to defendants' motion. The Court then set a briefing schedule for defendants to make a motion for judgment on the pleadings or for summary judgment.

### C. Plaintiff's Amended Complaint

Given counsel's representation that he could not in good faith seek to amend the complaint, we were surprised when plaintiff's counsel filed a cross-motion to amend the complaint pursuant to Fed. R. Civ. P. 15 as part of his opposition to defendants' motion.

The amended complaint ("Am. Compl."), which is pled entirely upon information and belief, omits many specific factual allegations from the original complaint which were not bourne out by the discovery in this case. For example, plaintiff removed the allegations that he "did not pose a threat" to other inmates, that he had no prior disciplinary history, that he was awaiting trial for a non-violent crime, that his attackers were members of the Bloods, and that he was attacked by "nine" inmates. *Compare* Compl. PP 13, 15-17, 19, 22 *with* Am. Compl. PP 12, 14-17, 19. Plaintiff also withdrew his claims against the guards specified [*10] in the original complaint, which withdrawal may be fairly read as a concession that the claims previously pled did not rise above ones for negligence. *Compare* Am. Compl. PP 7-8, 19-22, 26, 28 *with* Compl. P 20. Instead, the amended complaint seeks, without alleging any underlying facts, to

intone vague and conclusory language from broadly relevant case law.

Thus, plaintiff's amended complaint now asserts that he was placed in the general population where he was attacked by unknown assailants, that there was insufficient staffing, and that the lines of sight were inadequate to prevent the assault. Am. Compl. PP 13-14, 17, 19. Plaintiff also reiterates the classification claims about the admittedly unidentified assailants. Among the allegations about his unknown assailants are that they had numerous prior disciplinary infractions, including infractions for weapons possession, fighting infractions, and assaults on other inmates, had undergone insufficient security classification procedures and should not have been placed in the same area of the prison with the plaintiff. Am. Compl. PP 13-17, 19, 20-26. Moreover, plaintiff makes conclusory allegations that Chief Bailey and Warden [*11] Fraser, who were responsible for the safety of inmates at Rikers, implemented the alleged insufficient security classification procedures, knew of the alleged deficiencies in staffing and lines of sight, and that their actions constituted deliberate indifference to the plaintiff's safety. Am. Compl. PP 16-17, 20-28.

### D. Oral Argument

The Court held oral argument on April 19, 2001 to discuss the proposed motions and to ascertain if there was a factual basis for the plaintiff's amended complaint. At the oral argument, plaintiff's counsel recast the complaint once again. Before discussing plaintiff's recast complaint, it is helpful to review the potential factual allegations that plaintiff's counsel conceded were not being advanced:

(1) there is no assertion that any defendant or corrections officer had been placed on notice of any threat to the plaintiff, Tr., pp. 16-17;

(2) there is no assertion that any defendant or corrections officer had ever been advised by plaintiff that he felt any concern that he would be subject to an assault by another inmate, *Id.*; and

(3) there is no dispute that plaintiff was properly placed into a medium to high security are [*12] of the general population because of his prisoner classification (based on his past record of violent acts), *Id.*, p. 13.

2001 U.S. Dist. LEXIS 6979, *

Likewise, plaintiff's counsel clarified the scope of the legal arguments that were being advanced on his client's behalf:

> (4) that plaintiff's line of sight argument did not go so far as to suggest that the defendants were obligated to build the cell block out of plexiglass so that prisoners could be constantly observed, *Id.*, pp. 23-24;

> (5) that plaintiff's level of security and staffing argument was not that the levels of security and staffing were so low as to violate prisoners' constitutional rights generally, or that any particular ratio of guards to inmates was constitutionally required. Tr., pp. 20-22; and

> (6) that plaintiff's *Monell* argument did not assert that there was a policy or practice of leaving prisoners unattended. Tr., p. 24.

Rather, as explained at oral argument, plaintiff's claim, based on the incident report disclosed in discovery, is that the prison block containing 80 inmates on which plaintiff was housed was briefly unattended while one of the two corrections officers on duty left his post to complete [*13] a required report. *Id.* pp. 3-4. Specifically, at the time of plaintiff's assault, the "A" officer was at his regular station, while the "B" officer on duty was not inside the cell block because he was writing up a required hourly or daily report. Tr., p. 4. Thus, at the time of the incident, plaintiff was left unsupervised. *Id.* Plaintiff's counsel admitted that these specific allegations were not contained either in the original or amended complaint. *Id.*, p. 5.

## DISCUSSION

Assuming for purposes of the motion for judgment on the pleadings that the motion for leave to amend would be granted, [1] we nevertheless dismiss the complaint.

> 1  Rule 15 provides that leave to amend shall be freely given when justice so requires, Fed. R. Civ. P. 15(a), and the Supreme Court has held that absent "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party... [or] futility of amendment... the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182, 9 L. Ed. 2d

222, 83 S. Ct. 227 (1962)(quoting Fed. R. Civ. P. 15). Although we have sincere doubts about the propriety of the written amended complaint, we have fewer concerns about counsel's oral modifications. While there is evidence of bad faith and/or a dilatory motive, we need not resolve the question of whether to grant the requested leave to amend, given our conclusion that both the original complaint and the complaint as amended fail to state a claim upon which relief can be granted.

[*14] **A. Judgment on the Pleadings**

We evaluate the sufficiency of plaintiff's complaint after having considered the original complaint, the amended complaint and the supplemental allegations by plaintiff's counsel at oral argument. As noted earlier, the original complaint was unsupported by the discovered facts and the amended complaint was long on conclusory language and short on facts. More specific charges were added during oral argument. In this context, our function is "merely to assess the legal feasibility of the complaint, not to assay the legal feasibility of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980). In doing so, we evaluate a Rule 12(c) motion under the same standard as that applicable to a motion under Rule 12(b)(6). *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994), *cert. denied*, 513 U.S. 816, 130 L. Ed. 2d 28, 115 S. Ct. 73 (1994). Thus, for purposes of this motion, we accept as true all factual allegations in the amended complaint, and draw all inferences in favor of the non-moving party. *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir. 1999). We also accept [*15] as true the additional facts proffered by plaintiff's counsel at oral argument as if they had been incorporated into the amended complaint.

**B. Deliberate Indifference**

The constitutional rights of pre-trial detainees in the prison safety context under the Due Process Clause of the Fourteenth Amendment are at least as great as the protections available to convicted prisoners under the Eighth Amendment. *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 77 L. Ed. 2d 605, 103 S. Ct. 2979 (1983). While the precise standard applicable to similar claims under the Fourteenth Amendment is unsettled, it is clear that more than mere negligence is required to state a claim. *See, e.g., Bryant v. Maffucci*, 923 F.2d 979, 983 (2d Cir. 1991), *cert. denied*, 502 U.S. 849, 116 L. Ed. 2d 117, 112 S. Ct. 152 (1991). [2]

> 2  Neither the Second Circuit nor the Supreme Court has precisely defined the standard by which jailers' duty to protect pre-trial detainees from

other prisoners should be judged. Although in dicta the Second Circuit has suggested that the Eighth Amendment's "deliberate indifference" standard should be applied, *see Arroyo v. Schaefer*, 548 F.2d 47 (2d Cir. 1977)("While the Eighth Amendment may not, strictly speaking, be applicable to pretrial detainees, as Judge Friendly noted in *Johnson v. Glick* [citation omitted], *due process requires no more in this* [medical indifference] context.")(emphasis added), it has repeatedly passed on opportunities to establish a standard. *See, e.g., Bryant*, 923 F.2d at 983-984.

As the parties have briefed the issue assuming the applicablity of the Eighth Amendment standard, and as the result would not be altered were we to use a "gross negligence" or "recklessness" standard, *Cf. Bryant*, 923 F.2d at 983 (noting that the applicability of these standards, along with the deliberate indifference standard, remains unsettled), we will use the well-established case law under the Eighth Amendment as a framework for analysis.

[*16]

Prison officials are "under an obligation to take reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer*, 468 U.S. 517, 526-27, 82 L. Ed. 2d 393, 104 S. Ct. 3194 (1984). In particular, prison officials have a duty "'to protect prisoners from violence at the hands of other prisoners.'" *Farmer v. Brennan*, 511 U.S. 825, 833, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994) (citation omitted). In *Farmer*, the Supreme Court made it clear that "being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 69 L. Ed. 2d 59, 101 S. Ct. 2392 (1981)).

However, to state an Eighth Amendment claim, a plaintiff must allege sufficient facts to prove that he was incarcerated under conditions posing a substantial risk of serious harm to which the defendants were deliberately indifferent. *See, e.g., Candelaria v. Coughlin*, 1997 U.S. Dist. LEXIS 4513, 1997 WL 171256, at *10 (S.D.N.Y. 1997)(citing *Farmer*). While defendants do not dispute that the complaint meets the "objective" requirement by alleging a deprivation that is "sufficiently serious," *Farmer*, 511 U.S. at 834, [*17] defendants assert, and the Court agrees, that the "subjective" requirement that the defendants acted with "a sufficiently culpable state of mind," *id.*, has not been met.

Plaintiff's conclusory assertion that defendants acted with deliberate indifference is insufficient. *See Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996) (noting that "bald assertions and conclusions of law" are insufficient to

sustain a Rule 12(b)(6) motion). *See also Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 887 (2d Cir. 1987)(holding that "allegations which are nothing more than broad, simple and conclusory statements are insufficient to state a claim under § 1983"). Accepting as true the factual allegations set forth in the amended complaint, and even accepting the additional, more specific factual allegations set forth by his counsel at oral argument, plaintiff's allegations do not state a claim that defendants acted with a mental state equal to deliberate indifference, gross negligence or recklessness.

The plaintiff does not allege that any corrections officer was specifically aware of any substantial risk of harm to him, or aware that another inmate in the general population [*18] posed a substantial risk of harm to inmates generally, or to some subgroup of inmates, nor does he allege that there were any general or specific threats made against him, that there was any history of violence or ill-will between himself and gang members generally or other inmates generally, or his assailants in particular, or that he perceived himself to be at any risk of harm, let alone that he informed a prison official of any perceived risk to him. While plaintiff does allege that there was "racial tension" between rival prison gangs, plaintiff admits that he was not a gang member and has alleged no facts from which we can conclude that the defendants should have been aware of a substantial risk of serious harm to him specifically, or to other inmates in his situation. The mere presence of racial tension in a prison cannot mean that a subsequent assault is the result of deliberate indifference on the part of prison officials.

Thus, we conclude that plaintiff has failed to allege facts that could sustain a claim for deliberate indifference. *See, e.g., Jaipersaud v. A.R.D.C. Bldg. # C-74*, 1996 U.S. Dist. LEXIS 22670, 1996 WL 1086521, at *3 (E.D.N.Y. 1996)(no deliberate indifference for failure [*19] to post guard in prison mess hall where plaintiff alleged that, had a guard been present, he could have stopped his assault). *See also Candelaria v. Coughlin*, 1997 U.S. Dist. LEXIS 4513, 1997 WL 171256, at *1, *10 (S.D.N.Y. 1997)(no Eighth Amendment claim where victim's general complaints about safety and prison violence to prison official were insufficient to put him on notice of any particular risk of assault on victim even though assailant was a known threat due to prior assault on guards and other prisoners); *Smiley v. Westby*, 1994 U.S. Dist. LEXIS 13413, 1994 WL 519973, at *8 (S.D.N.Y. 1994)(no Eighth Amendment liability for "a random act" of prison violence). *Cf. Rangolan v. County of Nassau*, 217 F.3d 77 (2d Cir. 2000)(no Eighth Amendment violation where inmate was beaten by cellmate against whom he had cooperated as a confidential

2001 U.S. Dist. LEXIS 6979, *

informant, despite defendants' failure to implement successfully procedures to protect the informant).

At best, plaintiff's claim is that the custom or policy of filling out reports during a guard's shift could result, if there was not another guard available, in inmates being left unsupervised. Plaintiff concedes, however, that there was no policy to leave [*20] inmates unsupervised. Thus, it cannot reasonably be said that there was any policy that caused plaintiff's injuries.

To prevail in his claim against the City of New York, plaintiff must show that a municipal policy or custom caused the him to be deprived of his constitutional rights. *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978). For the reasons just discussed, there is no policy upon which a claim of municipal liability can be predicated. Accordingly, plaintiff's claim against the City of New York is dismissed.

In addition, in the absence of a policy based claim, there could be no viable claim against the guards on duty because they were at most negligent, as plaintiff apparently recognized in dropping his claims against the individual guards. Finally, in the absence of any policy/practice or personal involvement of Captain Bailey and Warden Fraser, no action can be maintained against the supervisors. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)(personal involvement in alleged constitutional deprivations is a prerequisite to an award of dam-

ages under § 1983). Accordingly, plaintiff's complaint against the individual defendants [*21] is dismissed.

We understand that, from plaintiff's point of view, the fact that the assault took place is sufficient to blame the prison's officials for failing to prevent it. Although it is unfortunate that plaintiff was injured, it is axiomatic that legally, not every injury suffered by one prisoner at the hands of another translates into constitutional liability for the prison officials responsible for the victim's safety. *Farmer*, 511 U.S. at 834. *See also McGriff v. Coughlin*, 640 F. Supp. 877, 880 (S.D.N.Y. 1986) ("The Constitution does not guarantee an assault-free prison environment....").

## CONCLUSION

For the reasons stated, defendants' motion for judgment on the pleadings is granted. Accordingly, plaintiff's amended complaint is dismissed in its entirety and the Clerk of the Court is directed to close the above-captioned case.

**IT IS SO ORDERED.**

DATED: New York, New York

May 29, 2001

NAOMI REICE BUCHWALD

UNITED STATES DISTRICT JUDGE

LEXSEE

**WILLIAM J. CARMODY, Plaintiff, - against - THE CITY OF NEW YORK; PO-LICE DEPARTMENT CITY OF NEW YORK; THE CIVILIAN COMPLAINT REVIEW BOARD; RAYMOND W. KELLY, Police Commissioner; JOSEPH ESPOSITO, Chief, Chief of Department; MURPHY, Lieutenant, Chief of Depart-ment; DARRYL WEIR, Sergeant, Chief of Department; RAFAEL PINEIRO, Chief, Personnel Bureau; ARNOLD S. WECHSLER, Director Employee Management Di-vision; KEVIN KENNEY, Sergeant, Employee Management Division; CHARLES V. CAMPISI, Chief Internal Affairs Bureau; PIGNATARO, Captain, Internal Affairs Bureau Group 22; MATTHEW GRACEN, Lieutenant, Internal Affairs Bureau Group 22; MARLENE BEAMAN, Lieutenant, Internal Affairs Bureau Group 22; RIVERA, Sergeant, Internal Affairs Bureau Group 22; FLORENCE L. FINKLE, Executive Director, Civilian Complaint Review Board; VANESSA J. ROSEN, Inves-tigator, Civilian Complaint Review Board; each defendant being sued in their indi-vidual and official capacity, Respondents.**

05 Civ. 8084 (HB)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2006 U.S. Dist. LEXIS 25308**

**May 11, 2006, Decided
May 11, 2006, Filed**

**SUBSEQUENT HISTORY:** As Amended. Summary judgment granted by Carmody v. City of New York, 2006 U.S. Dist. LEXIS 83207 (S.D.N.Y., Nov. 13, 2006)

**COUNSEL:** [*1] For William J. Carmody, Plaintiff: Eric Sanders, Law Office of Jeffrey L. Goldberg, P.C., Lake Success, NY.

[*2] For The City of New York, Police Department City of New York, The Civilian Complaint Review Board, Police Com-missioner Raymond W. Kelly, indi-vidual, Police Commissioner Raymond W. Kelly, in his official capacity, Chief Jo-seph Esposito, Chief of De-partment, individual, Chief Joseph Esposito, Chief of Department, in his official capacity, Lieutenant Murphy, Chief of Department, individual, Lieutenant Murphy, Chief of Department, in his official capacity, Sergeant Darryl Weir, Chief of Department, individual, Sergeant Darryl Weir, Chief of Department, in his official ca-pacity, Chief Rafael Pineiro, Personnel Bureau, individual, Chief Rafael Pineiro, Personnel Bureau, in his offi-cial ca-pacity, Sergeant Kevin Kenney, Employee Man-agement, individual, Sergeant Kevin Kenney, Employee Management, in his official capacity, Chief Charles V. Campisi, Internal Affairs Bureau, individual, Chief Charles V. Campisi, Inter-nal Affairs Bureau, in his offi-cial capacity, Captain Pignataro, Internal Affairs Bureau Group 22, individual, Captain Pignataro, Internal Affairs Bureau Group 22, in his [*2] official capacity, Lieuten-ant Gracen, Internal Affairs Bureau Group 22, individ-ual, Lieutenant Gracen, Internal Affairs Bureau group 22, in his/her official capacity, Lieutenant Marlene Bea-man, Internal Affairs Bureau Group 22, individual, Lieu-tenant Marlene Beaman, Internal Affairs Bureau Group 22, in her official capacity, Sergeant Rivera, Internal Affairs Bureau Group 22, individual, Sergeant Rivera, In-ternal Affairs Bureau Group 22, in his/her official capacity, Executive Director Florence L. Finkle, Civilian Complaint Review Board, individual, Executive Director Florence L. Finkle, Civilian Complaint Review Board, in her official ca-pacity, Investigator Vanessa J. Rosen, Civilian Complaint Review Board, individual, Investiga-tor Vanessa J. Rosen, Civilian Complaint Review Board, in her official capacity, Arnold S. Weschler, Defendants: Lawrence John Profeta, New York City Office of Corpo-ration Counsel, New York, NY.

**JUDGES:** HAROLD BAER, JR., District Judge, U.S.D.J.

**OPINION BY:** HAROLD BAER, JR.

**OPINION**

### AMENDED OPINION & ORDER

**Hon. HAROLD BAER, JR., District Judge:**

Plaintiff, William Carmody, filed a complaint against the above-named seventeen defendants alleging that they engaged in several incidents of harassment, retaliation, [*3] and conspiracy against him in violation of federal and state civil rights laws while he was a police officer with the New York City Police Department ("NYPD"). [1] Defendants moved to partially dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure Rule 12(b)(6) for failure to state a claim upon which relief can be granted as to seven of the individually-named defendants, Joseph Esposito, "Murphy", Rafael Pineiro, Charles V. Campisi, "Pignataro", Matthew Gracen, and "Riveria." Additionally, Defendants NYPD (sometimes "Department") and the Civilian Complain Review Board ("CCRB") moved to dismiss the complaint on the basis that they are not suable entities under the New York City Charter. This motion was GRANTED as to these nine defendants.

> [1] Plaintiff brings his claim pursuant to the following federal and state laws: 42 U.S.C. § 2000e-3, 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 1985, New York State Executive Law § 296, New York City Administrative Code § 8-502, and New York State common law.

This [*4] Amended Order addresses whether the conspiracy and state law tort claims should be dismissed as to the remaining eight defendants. For the reasons stated below, this motion to dismiss with regard to these eight defendants is GRANTED in part, and DENIED in part.

### I. BACKGROUND

In a Rule 12(b)(6) motion, the allegations in the Plaintiff's Amended Complaint are taken as true. See Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995). Plaintiff recounts the following. He was hired as a NYPD officer around July 2002. Plaintiff's harassment and retaliation by the above-named defendants began when he was transferred to the 43rd Precinct in January 2003. At the 43rd Precinct, Plaintiff, a white male, was assigned to Operation Impact and partnered with Police Officer Manuel Gomez, a Hispanic officer. During their partnership, Gomez filed a discrimination lawsuit against the NYPD. As a result of this lawsuit and Plaintiff's close association with Gomez, Plaintiff alleges

that certain police officers discriminated against and harassed him. Plaintiff alleges that the harassment and retaliation increased after he, along with four other officers, exposed misconduct in the 43rd Precinct and reported such misconduct to the Internal Affairs Bureau ("IAB"). Around February 5, 2004, plaintiff was notified by defendant, Florence Finkle, that certain allegations of misconduct had been found to be substantiated as against [*5] him by defendant Vanessa Rosen, CCRB Investigator.

In March 2004, Plaintiff filed an official complaint with the Department Advocate's Office, Patrolman's Benevolent Association ("PBA") as well as defendant, Finkle, with regard to defendant Rosen's actions during the misconduct investigation. Plaintiff claims that Rosen intentionally omitted crucial information that would have cleared him of all misconduct charges. On approximately December 14, 2004, Plaintiff filed a discrimination complaint with the Equal Employment Opportunity Commission ("EEOC"). [2] Plaintiff was terminated by the Department on February 22, 2005 for misconduct as well as residency fraud. As a result of the actions above, Plaintiff requests compensatory and punitive damages from the above-named defendants.

> [2] Plaintiff received a right-to-sue letter from the EEOC on June 22, 2005.

### II. STANDARD OF REVIEW

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure [*6] , the movant must establish that the plaintiff failed to "state a claim upon which relief can be granted." FED. R. CIV. PRO. 12(b)(6). In ruling on a Rule 12(b)(6) motion, this Court must construe all factual allegations in the complaint in favor of the non-moving party. SeeKrimstock v. Kelly, 306 F.3d 40, 47-48 (2d Cir. 2002). A motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Shakur v. Selsky, 391 F.3d 106, 112 (2d Cir. 2004) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).

### III. DISCUSSION

Plaintiff brings retaliation and hostile work environment claims against defendants pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, New York State Executive Law § 296, and New York City Administrative Code § 8-502. He brings a conspiracy claim pursuant to 42 U.S.C. §§ 1983, 1985(3) as well as an intentional infliction of emotional distress and intentional [*7] interference with an employment contract claim pursuant to the New York State common law. For the most part, plaintiff's claims charge that the defen-

dants engaged in a conspiracy to violate his constitutional rights as well as harassed and retaliated against him while he served as a NYPD officer.

### A. NYPD and CCRB

To begin with, Defense counsel contends that the NYPD and the CCRB are not suable entities in their independent capacities, thus, all claims against these parties should be dismissed. I agree.

NYPD and CCRB are agencies of the City of New York. Pursuant to the explicit terms of the New York City Charter, all actions that allege violations of law against a Department of the City must be brought in the name of the City of New York, and not the Department. See NEW YORK CITY CHARTER § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."); See also Montes v. King, 2002 U.S. Dist. LEXIS 4412, 2002 WL 424318, *5 (S.D.N.Y. Mar. 19, 2002) (providing that the New York City Police Department is not a suable entity).   [*8] Consequently, all claims against the NYPD and the CCRB are dismissed.

### B. Individually Named Defendants

Joseph Esposito, "Murphy", Rafael Pineiro, Charles V. Campisi, "Pignataro", Matthew Gracen, and "Riveria" move to dismiss the claims filed against them based on the failure of the plaintiff to allege any personal involvement in the alleged misconduct. ³ Since this is my reading of the complaint as well, the motion to dismiss is granted. An analysis as to these claims follows.

3   Defendant does not challenge the sufficiency of the plaintiff's claims in this matter and, correspondingly, this Court does not rule on that basis.

### 1. Title VII Claims Against the Seven Movants

This section will discuss the retaliation and hostile work environment claims plaintiff alleges under Title VII of the Civil Rights Act of 1964. Plaintiff also alleges retaliation and hostile work environment pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981. The § 1981 claim is discussed [*9] in Part Two below.

### A. Retaliation

Plaintiff contends that defendants retaliated against him in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3. ⁴ To establish a claim here, the plaintiff must allege the prongs necessary to prove a prima facie case. They include: 1) that plaintiff engaged in a protected activity known to the defen-

dant, 2) suffered an adverse employment action, and 3) there exists a causal connection between the protected activity and the adverse employment action. SeeGordon v. New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000). Here, the Amended Complaint clearly alleges the second element, namely, that he suffered an adverse employment action. SeeMorris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999) (providing that an adverse employment action may include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand."). Plaintiff was discharged in February 2005.

4   This section makes it illegal for an employer to discriminate against an employee based on participation in any Title VII enforcement or investigation action.

[*10] However, Plaintiff failed to sufficiently plead the first and third elements required to establish a retaliation claim. Plaintiff states that he filed an official complaint with the PBA in March 2004 as well as an EEOC complaint in November 2004. Amended Complaint P37, P47. Both complaints qualify as protected activities under Title VII. See, e.g., Raniola v. Bratton, 243 F.3d 610, 624 (2d Cir. 2001). However, Plaintiff failed to allege that any of the seven defendants knew of either the EEOC complaint or the internal complaint filed with PBA, as required to meet the first element.

Further, the Plaintiff fails to satisfy the third element. Although Plaintiff was fired a couple of months after he filed the EEOC complaint, as mentioned previously, it is not alleged that any of the defendants knew about either complaint. Without this knowledge, the requisite causal connection between the adverse employment action and the protected activity is not made out and the claim must fail.

The motion to dismiss the Title VII retaliation claim is granted as to all seven individual defendants.

### B. Hostile Environment Claim

To state a claim under Title VII for hostile [*11] work environment, the Plaintiff must allege that their work environment was "abusive." Harris v. Forklift, 510 U.S. 17, 22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). A work environment is abusive when harassment has reached a level that is "sufficiently severe or pervasive [so as] to alter the conditions of the victim's employment." Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986) (internal quotation marks omitted). This Court looks at the totality of the circumstances to determine harassment. This includes "the quantity, frequency, and severity of the incidents." Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 437 (2d Cir. 1999) (internal

quotation marks and citations omitted). To succeed, the Plaintiff must show that "either a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (internal quotation marks omitted).

The Plaintiff does not allege any instances of abusive behavior or harassment [*12] against the seven individually named defendants. Put another way, there is nothing in the Complaint to suggest that any of the defendants contributed to the hostile work environment Plaintiff contends he endured while employed with the NYPD.

The motion to dismiss this claim too is granted as to all defendants.

### 2. § 1981 and § 1983

Section 1981 forbids discrimination with regard to the conditions of a contractual relationship while § 1983 allows individuals to sue others who violate their constitutional rights. To state a claim against an individual pursuant to 42 U.S.C. § 1981 and § 1983, a plaintiff must set forth facts that establish the personal involvement of the individual in the alleged deprivation of civil rights. See, e.g., Back v. Hastings on Hudson Union Free School District, 365 F.3d 107, 127 (2d Cir. 2004) (dismissing § 1983 claim against defendant where there was no allegation or material fact that demonstrated that he directly engaged in any discriminatory conduct); Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000) (dismissing § 1981 claim against [*13] individual for failure to demonstrate personal involvement by the defendant). Personal involvement can be demonstrated in any of the following ways: 1) defendant directly participated in the alleged wrongdoing, 2) defendant failed to remedy the wrong after being informed via a report or appeal, 3) defendant created a policy or custom under which unconstitutional acts occurred, or allowed the continuance of such policy, 4) defendant was grossly negligent in supervising subordinates who committed the illegal acts, or 5) defendant exhibited deliberate indifference by failing to act on information indicating unconstitutional acts were occurring. Back, 365 F.3d at 127. Merely holding a position of authority or supervision is not enough. See, e.g., Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).

With the exception of broad, conclusory allegations stated in the plaintiff's enumerated claims, no factual allegations of wrongdoing are asserted against six of the defendants -- Joseph Esposito, "Murphy", Charles V. Campisi, "Pignataro", Matthew Gracen, and "Riveria." See Amended Complaint PP79 et seq. Further, nowhere in the Amended Complaint does [*14] the Plaintiff al-

lege that any of these six defendants participated, either directly or in their supervisory capacity, in the alleged illegal acts. [5] Without this, the motion to dismiss the § 1981 and § 1983 claims must, and hereby are, granted as to these individuals.

> 5  Plaintiff's reply brief argues that these defendants were personally involved in the alleged illegal acts, primarily in their supervisory capacities. However, the citations to the Amended Complaint do not discuss any wrongful acts by the defendants, nor even mention any of the defendants by name.

With regard to defendant Rafael Pineiro, identified in the Amended Complaint as Chief of the Personnel Bureau, Plaintiff alleges that he submitted a memorandum to Pineiro outlining the retaliatory actions by officials at NYPD. Amended Complaint P48. Although not plead, Pineiro presumably did nothing upon receipt of the memorandum from plaintiff. This fact, if true, may have been helpful, but even if alleged, and it was not, courts have concluded [*15] that merely sending a letter to a supervisory official does not rise to the level of personal liability. See, e.g., Garrido v. Coughlin, 716 F. Supp. 98, 100 (S.D.N.Y. 1989) (finding that defendant's failure to respond to plaintiff's letter of protest or to request an investigation of the plaintiff's allegations was insufficient to establish liability). While clearly this inaction does not posit personal liability for Chief Pineiro, it should not be confused with being a badge of honor either. A system whereby letters, especially letters from members of the force, are answered and answered promptly is obviously to be preferred.

Further, there is no allegation that Pineiro was either grossly negligent or exhibited deliberate indifference in his purported decision not to follow-up on plaintiff's memorandum. SeeGant ex rel. v. Wallingford Bd. of Educ., 195 F.3d 134, 141 (2d Cir. 1999) ("Deliberate indifference can be found when the defendant's response to known discrimination 'is clearly unreasonable in light of the known circumstances.'"). Plaintiff does not even allege whether or not there was a duty for Pineiro to investigate. In fact, it appears [*16] there was a formal grievance procedure via the PBA by which to adjudicate Plaintiff's grievance and it was never utilized. Without more, I find that Plaintiff's §§ 1981 and 1983 claims against Pineiro must fail.

### 3. Conspiracy Claims

Plaintiff also contends that the defendants conspired to violate his constitutional rights pursuant to §§ 1983 and 1985(3). In order to survive a motion to dismiss on a § 1983 conspiracy claim, the plaintiff must allege 1) an agreement between two or more state actors, 2) con-

certed acts to inflict an unconstitutional injury, and 3) an overt act in furtherance of the goal. See, e. g., Ciambriello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002). A complaint that includes vague allegations and fails to include specific instances of misconduct will not withstand a motion to dismiss. See, e.g., Id. Specifically, plaintiff must provide a factual basis that supports an allegation that the defendants "entered into an agreement, express or tacit, to achieve the unlawful end." Romer v. Morgenthau, 119 F. Supp. 2d 346, 363 (internal quotations and citations omitted). The same standard applies under both [*17] sections. See Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003) (stating that a conspiracy claim under § 1983 "should actually be stated as a claim under Section 1985, which applies specifically to conspiracies.") [6]

> 6   To state a claim under 42 U.S.C. § 1985(3), a plaintiff must plead: 1) a conspiracy, 2) for the purpose of depriving, either directly or indirectly, any person of equal protection of the law, 3) an act in furtherance of the conspiracy, 4) injury. SeeStraker v. Metro. Transit Auth., 333 F. Supp. 2d 91, 98 (E.D.N.Y. 2004).

The plaintiff fails to allege the prerequisites needed to sustain a conspiracy claim against any of the individual defendants. As mentioned above, plaintiff fails to allege any agreement in the Amended Complaint between six of the seven defendants (Joseph Esposito, "Murphy", Charles V. Campisi, "Pignataro", Matthew Gracen, and "Riveria"). With regard to Pineiro, paragraph 48 of the Complaint fails to allege facts that would suggest that Pineiro conspired with anyone to violate the plaintiff's constitutional rights. The extent of the allegation against Pineiro is that he received from Plaintiff a memorandum that outlined the harassment [*18] and retaliatory activity of the other named defendants toward the Plaintiff. There is no allegation to even suggest an agreement by Pineiro with one or more of the individual defendants, or for that matter anyone else, to violate § 1983 or § 1985(3). Thus, the motion to dismiss is granted with respect to the conspiracy claims brought against all seven defendants.

#### 4. State Law Claims

Since I have granted the motion to dismiss as to the federal claims over which I had original jurisdiction, I decline to exercise pendent jurisdiction over the state law claims with regard to seven of the individually named defendants (Joseph Esposito, "Murphy", Charles V. Campisi, "Pignataro", Matthew Gracen, and "Riveria") as well as the NYPD and CCRB. See 28 U.S.C. § 1367(c)(3). As such, the state law claims against all of these entities are dismissed.

#### C. Remaining Defendants

The, remaining eight defendants, City of New York, Darryl Weir, Arnold S. Wechsler, Kevin Kenney, Marlene Beaman, Raymond W. Kelly, Florence L. Finkle, and Vanessa J. Rosen move to dismiss the conspiracy claims brought pursuant to §§ 1983 and 1985(3) as well as the state law tort claims against them. The motion is granted in part, and denied in part.

#### 1. Conspiracy Claims

As stated above, the plaintiff must allege 1) an agreement between two or more state actors, 2) concerted acts to inflict an unconstitutional injury, and 3) an overt act in furtherance of the goal to survive a motion to dismiss a § 1983 conspiracy claim. See, e.g., Ciambriello, 292 F.3d at 324-25. [7] Even assuming plaintiff sufficiently alleged agreement between these defendants, it is doubtful whether the Plaintiff satisfied the second element and demonstrated that the defendants acted with the purpose to inflict an unconstitutional injury. The U.S. Supreme Court has stated that "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action" to give rise to § 1985(3) liability. Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S. Ct. 1790, 29 L. Ed. 2d 338 (1971). Plaintiff is a white male. He does not allege that the discrimination he allegedly suffered was motivated by his membership in a protected class. Instead, he appears to base his alleged injury on his police partner's membership in a protected class. His partner is Hispanic.

> 7   As mentioned previously, the same standard applies for a conspiracy claim brought pursuant to § 1985(3).

Even if the Amended Complaint is read to suggest that this is enough, it appears that the conspiracy claims against the remaining defendants is also barred due to the intra-enterprise conspiracy doctrine, also known as the intra-corporate conspiracy doctrine. The doctrine states that individuals of a single entity that act within the scope of their employment cannot conspire with each other. The doctrine originated in the corporate context, but has been applied most recently to public entities. See, e.g. Straker v. Metro. Transit Auth., 2005 U.S. Dist. LEXIS 30956, at 8-10 (E.D.N.Y. Dec. 5, 2005) (applying intra-corporate conspiracy doctrine to alleged conspiracy perpetrated by New York City Transit Authority); Salgado v. City of New York, 2001 U.S. Dist. LEXIS 3196, 2001 WL 290051, at 9 (S.D.N.Y. Mar. 26, 2001) (finding that § 1985(3) claim is barred under the intra-enterprise conspiracy doctrine because all defendants are agents of the City of New York). Since all defendants are employees or agents of the City of New York, I find that

the intra-enterprise conspiracy doctrine also bars this claim. [8]

> 8  Plaintiff has not alleged, nor argued, that any of the defendants had an independent, personal motive for their behavior towards the plaintiff, thus, I do not decide whether the "personal interest" exception to this doctrine applies.

For the above reasons, the motion to dismiss is granted with respect to the conspiracy claims brought against these defendants as well.

*2. State Law Tort Claims*

These eight defendants argue that the state common law claims of intentional infliction of emotional distress and intentional interference with an employment contract are barred against them because the plaintiff failed to file a notice of claim as required by New York General Municipal Law. I disagree.

It is undisputed that the plaintiff failed to file a notice of claim in this case. [9] But, I do not think that is required under New York State law when an action is brought against employees of public corporations. New York General Municipal Law provides that:

> Service of the notice of claim upon an officer, appointee or employee of a public corporation *shall not be* a condition precedent to the commencement of an action or special proceeding against such person.

N.Y. GEN. MUN. § 50e-(1)(b)(emphasis added). Defense counsel does not argue that this provision is inapplicable to the remaining defendants. As such, the motion to dismiss both the intentional infliction of emotional distress and intentional interference with an employment contract claims are denied with regard to the remaining defendants.

> 9  Plaintiff does not allege that he did so either in his Amended Complaint or in the motion papers submitted to this Court.

### IV. CONCLUSION

For the reasons above, this motion to dismiss all claims was granted with prejudice as to individual defendants Joseph Esposito, "Murphy", Rafael Pineiro, Charles V. Campisi, "Pignataro", Matthew Gracen, and "Riveria" on the grounds of lack of personal involvement. The motion to dismiss was granted without prejudice as to the NYPD and the CCRB. This Opinion is amended to dismiss the conspiracy claim, with prejudice, as to the remaining eight defendants, but the motion to dismiss the state law tort claims, as to these defendants, is denied.

**IT IS SO ORDERED.**

New York, New York

May 11, 2006

[*19] Harold Baer, Jr.

U.S.D.J.

LEXSEE

**Johnnie L. Petway, Plaintiff, v. City of New York, New York City Police Department, New York City Fire Department, Emergency Medical Services Command of the New York City Fire Department, Police Officer Robert Grau, Police Officer Ernest Barone (Shield # 25445), Sergeant Anthony Motolla (Shield # 03687), EMS Lt. Joanne Miller, James McDermott, Richard Hickey, New York City Fire Department Fireman John Doe # 1, New York City Fire Department Fireman John Doe # 2, Defendants.**

**02-CV-2715 (NGG) (LB)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

**2005 U.S. Dist. LEXIS 37783**

**September 2, 2005, Decided
September 2, 2005, Filed**

**NOTICE:**    [*1] NOT FOR PUBLICATION

**COUNSEL:** For Johnnie Petway, Plaintiff: Charles H. Ryans, Jr., Charles H. Ryans, Esq., New York, NY.

For City of New York, FDNY, NYPD, Hickey, Battalion Chief, NYFD EMS, James McDermott, Borone, Police Officer, Shield # 25445, A. Mattola, P.O. Sgt., Shield # 03687, Defendants: Mary Theresa O'Flynn, Corporation Counsel of the City of New York, New York, NY.

**JUDGES:** Nicholas G. Garaufis, United States District Judge.

**OPINION BY:** Nicholas G. Garaufis

**OPINION**

MEMORANDUM & ORDER

    GARAUFIS, United States District Judge.

    In this action, Johnnie Petway (the "Plaintiff") brings suit against the defendants (collectively, "Defendants") pursuant to 42 U.S.C. § 1983 and various state tort laws. Specifically, the Plaintiff seeks relief for violations of his Fourth and Fourteenth Amendment rights and for state-law tort causes of action which include assault, battery, and false imprisonment. At this time, the court considers the Defendants' motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, the motion is granted in part and denied in part.

**I.  [*2]  Background**

    On January 30, 2001, the Plaintiff was in his living quarters at 556 Gates Avenue in Brooklyn, New York. (Am. Compl. at 2.) He smelled smoke, went to investigate, and saw a small fire in his hallway. (Id.) After seeing the fire, the Plaintiff went downstairs to find a fire extinguisher. (Id.) As he descended the stairway, the lights went off. (Id.) The Plaintiff's pets were still upstairs, and fearing for their safety, he rushed back towards his apartment. (Id.) As he was going up the stairs, the Plaintiff slipped, fell, and sustained burns on his right hand, his fingers, his thumb, his left ear, and the left side of his face. (Id.) When he returned upstairs, he saw that the fire had begun to rage out of control. (Id.) The Plaintiff then opened the door to his residence, and two of his dogs escaped with him down the stairs. (Id. at 3.) Three of his dogs, however, remained inside as the Plaintiff determined that the fire was too intense for him to attempt to rescue them. (Id.)

    Once outside, he yelled for someone to call 911. (Id.) The New York City Fire Department ("FDNY") soon arrived. (Id.) Immediately upon their arrival, the [*3] Plaintiff approached Battalion Chief Richard Hickey. (Id.) He explained to Hickey that his dogs were upstairs and Hickey assured the Plaintiff that they would rescue the dogs. (Id.) The Plaintiff, however, observed that no efforts were being made to rescue the dogs or to put out the fire. (Petway Dep. at 63.) As a result, the Plaintiff again approached Hickey and asked him why no

one was trying to rescue his pets or put water on the fire. (Id.) Hickey told him to "get out of here." (Id., Am. Compl. at 3.) Believing his question to be reasonable, the Plaintiff asked Hickey again when he would rescue the pets. (Id. at 63-64.) Hickey told him, "Get the hell out of here." (Id., Am. Compl. at 3-4.) Soon afterwards, two or three firemen grabbed the Plaintiff, shoved him, and told him "to get the fuck out of here." (Am. Compl. at 3-4.) The Plaintiff identified one of these firemen as Lieutenant James McDermott. (Petway Dep. at 66.)

A shoving match ensued between the firemen and the Plaintiff and the Plaintiff refused to be pushed back away from his home any further. (Id. at 70-71.) At that point, according to the Plaintiff, Lt. McDermott took off his helmet, and [*4] struck the Plaintiff in the head with it. (Id. at 71, 72-74, 76.) Police Officer Ernest Barone then handcuffed the Plaintiff's wrists behind his back. (Id. at 77, 80.) The Plaintiff alleges that Lt. McDermott punched him once again while he was handcuffed, specifically that McDermott struck him in the face with such force that he broke the Plaintiff's nose. (Id. at 77, 80-81, 83.) Shortly afterwards, the handcuffs were removed. (Id. at 80.)

Two police officers then escorted the Plaintiff across the street. (Id. at 86.) The Plaintiff was told there that he would be brought to the hospital. (Id. at 86.) The Plaintiff responded that he "wasn't looking to go to the hospital." (Id. at 86-87.) The Plaintiff was then informed by EMS Officers, Lieutenant Joanne Miller and Sergeant Anthony Motolla that he had no choice in the matter and that he would be brought to the hospital against his will if necessary. (Id. at 87.) The Plaintiff was told that he could go to the hospital "voluntarily and willingly" or that he would be brought to jail and transported to the hospital from there. (Id.) The Plaintiff continued to protest. (Id.) Lt. Miller explained that [*5] they could bring him to the hospital even against his wishes if they determined that his condition was a matter of life and death. (Id. at 87.) Sgt. Motolla told the Plaintiff that if he did not cooperate, they would "threaten to tranquilize" him. (Id.) The Plaintiff expressed concerns about physical ailments he suffered and medication he took, and the possibility of an allergic reaction to tranquilization. (Id.) Ultimately, facing the threat of tranquilization, the Plaintiff agreed and went to the hospital. (Id.) He was brought initially to the emergency room. (Id. at 94.) Afterwards, he was brought to the burn unit, where he remained for over two weeks. (Id. at 95.)

Proceeding pro se and in forma pauperis, the Plaintiff filed his initial complaint on April 29, 2002. (April 29, 2002 Compl.) On February 14, 2003, he filed an amended complaint. (Feb. 14, 2003 Am. Compl.) In August of that year, the Plaintiff retained Charles Ryans as his attorney. (Aug. 12, 2003 Notice of Appearance by Charles H. Ryans, Jr.) Discovery was completed on November 8, 2004. (Oct. 18, 2004 Order.) On March 4, 2005, the Defendants moved for summary judgment. (March 4, 2005 Notice [*6] of Motion for Summary Judgment.)

## II. Discussion

Summary judgment is proper when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In deciding a motion for summary judgment, the court must construe the facts in the light most favorable to the non-moving party, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), and all reasonable inferences and ambiguities must be resolved against the non-moving party. Flanigan v. GE, 242 F.3d 78, 83 (2nd Cir. 2001). Where there are no such genuine issues of fact, and all facts, inferences, and ambiguities are construed in favor of the non-moving party, summary judgment for the moving party is appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Mack v. Otis Elevator Co., 326 F.3d 116, 119-20 (2d Cir. 2003) [*7] (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

### A. Claims Against NYPD, FDNY, and EMS

The Defendants contend, and indeed the Plaintiff does not dispute, that the Plaintiff's claims against the New York City Fire Department ("FDNY"), the New York City Police Department ("NYPD"), and the Emergency Medical Services Command of the New York Fire Department ("EMS") should be dismissed on summary judgment because these three entities are not suable. See Parker v. DeBuono, 1999 U.S. Dist. LEXIS 15019, 98 Civ. 5765, 1999 WL 771365 (S.D.N.Y. Sep. 28, 1999), at *2 (NYPD, EMS, and FDNY are not suable entities); McAllister v. New York City Police Dep't, 1998 U.S. Dist. LEXIS 8847, 97 Civ. 7420, 1998 WL 314732, at *1 (S.D.N.Y. June 15, 1998) (NYPD is not a suable entity). "Pursuant to Rule 17(b) of the Federal Rules of Civil Procedure, the capacity [of a government agency] to sue or be sued must be determined by the law of the State in which the district court is held. The State of New York has neither expressly given nor necessarily implied that the NYPD, FDNY or EMS can sue or be sued in their individual capacities. [*8] " Parker, 1999 U.S. Dist. LEXIS 15019, 1999 WL 771365, at *2 (citations and

2005 U.S. Dist. LEXIS 37783, *

quotations omitted). [1] Plaintiff's claims against the FDNY, NYPD and EMS are therefore dismissed.

> 1  It should be noted that the EMS merged with the FDNY in 1996. New York City Fire Department, History and Heritage / EMS, at http://nyc.gov/html/fdny/html/history/ems.shtml; see also Giuliani's Budget Plan: the Overview, N.Y. TIMES, May 10, 1996, at A1. As part of the FDNY, which is not a suable entity, the EMS remains not suable.

### B. Verbal Harassment and 42 U.S.C. § 1983

The Defendants argue that to the extent the Plaintiff bases his § 1983 claim on verbal harassment by the defendants, it ought to be dismissed because verbal abuse does not amount to a violation of a federally protected right. (Defs. Mem. at 17.) "Generally, mere verbal abuse, and even vile language, does not give rise to a cognizable claim under 42 U.S.C. § 1983." Beal v. City of New York, 1994 U.S. Dist. LEXIS 5269, 92 Civ. 0718, 1994 WL 163954, [*9] at *6 (S.D.N.Y. April 22, 1994); see also Ramirez v. Holmes, 921 F. Supp. 204, 210 (S.D.N.Y. 1996) ("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983."). Verbal threats do not typically amount to a violation of § 1983 unless they rise to the level of a 'brutal and wanton act of cruelty.' Beal, 1994 U.S. Dist. LEXIS 5269, 1994 WL 163954, at *6. In rare cases where a defendant has been held liable under § 1983 for verbal threats, the cases have involved "threats that were grossly disproportionate to the need for action under the circumstances, and that were inspired by malice rather than merely careless or unwise excess of zeal so that [they] amounted to an abuse of official power that shocks the conscience." Id. (citations and quotations omitted).

In the present case, the Plaintiff alleges that FDNY personnel told him to get out of the way, to "get the hell out of here," and to "get the fuck out of here." (Petway Dep. at 63-65, Am. Compl. at 3-4.) In addition, the Plaintiff claims that Sgt. Motolla threatened to tranquilize the Plaintiff when he refused to go to the hospital. [*10] (Petway Dep. at 88.) Given that at the time a fire was raging and Plaintiff was bloodied and suffering from severe burns over his face, ear, hand, and fingers, see Pl. Am. Compl. at 2; Petway Dep. at 85, 88, 95; Miller Dep. at 25, the statements made here by government officials cannot reasonably be considered "brutal or wonton" cruelty. Nor do these statements "shock the conscience" in light of the circumstances and Plaintiff's medical condition. Moreover, the Plaintiff himself states that he has made no claim of verbal harassment. (Pl. Opp. at 20.) Claims of verbal harassment under § 1983 are therefore dismissed. [2]

> 2  It should also be noted that the Defendants, in their motion papers, argue that their failure to save the Plaintiff's dogs did not violate the Plaintiff's constitutional rights. (Defs. Mem. 6.) However, the Plaintiff's complaint never alleged that such failure amounted to a constitutional violation, and indeed the Plaintiff himself explained that this was not material to his constitutional claims against the Defendants. (Pl. Opp. at 2.) As these claims were never raised, they are not considered among the claims maintained by the Plaintiff.

### [*11] C. Officer Grau

The Defendants contend, in addition, that claims against Officer Grau ought to be dismissed because the Plaintiff has conceded that Officer Grau did nothing to him. (Defs. Mem. at 5.) The Plaintiff made no response to this contention. At his deposition, the Plaintiff acknowledged that there was "nothing between [him] and Mr. Grau" and that Officer Grau had done "absolutely nothing" to him as far as he knew. (Petway Dep. at 112-13.) A plaintiff must at least allege that he suffered an injury by a defendant for his claim against that defendant to survive summary judgment. Wachtler v. County of Herkimer, 35 F.3d 77, 82 (2d Cir. 1994); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) (a concrete and particularized injury that is traceable to challenged action of the defendant is required for a plaintiff to have standing to bring a claim). Here, since the Plaintiff does not allege that Officer Grau caused him any injury, the Plaintiff's claims against Officer Grau are dismissed.

### D. Unidentified Officers

#### i. Rule 4(m) of the Federal Rules of Civil Procedure

The Defendants [*12] argue that the claims of excessive force against two unnamed officials should be dismissed because the Plaintiff has failed to identify these parties in the nearly three years that have passed since the start of this litigation. (Defs. Mem. at 8.) In response, the Plaintiff argues that the unknown identities of these two officials merely raises an issue of fact that should be left for the jury to decide. (Pl. Opp. at 5.) In addition, the Plaintiff requests that the court order the Defendants to produce documents that the Plaintiff has previously sought so that he might better be able to identify the unnamed individuals. (Id. at 5-6.) The Defendants further argue that even if the claims are not dismissed for lack of identification, they should nonetheless be dismissed because the officers' actions were reasonable under the circumstances. (Id.) Because the court determines that the claims should be dismissed due to

2005 U.S. Dist. LEXIS 37783, *

untimely service, it need not address the issue of the reasonableness of the officials' acts.

As a general rule, federal courts disfavor the use of unidentified "John Doe" defendants, but recognize that in certain situations a plaintiff may not be in a position to [*13] know the actual identity of a defendant and therefore should be permitted to proceed against an unidentified party. Covington v. Warden of C-95, 1996 U.S. Dist. LEXIS 21278, 93 CV 1958, 1996 WL 75211, at *4 (E.D.N.Y. Feb. 8, 1996). Nonetheless, a plaintiff's obligation to serve a defendant in a timely fashion is not waived merely because a plaintiff has filed a complaint against an unnamed party. Cammick v. City of New York, 1998 U.S. Dist. LEXIS 18006, No. 96 Civ. 4374, 1998 WL 796452, at *1 (S.D.N.Y. Nov. 17, 1998). The Federal Rules of Civil Procedure direct that a party serve a defendant within 120 days of filing the complaint. Fed. R. Civ. P. 4(m). In the event that a plaintiff fails to serve process upon a defendant within that time period, the court "shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period." Id.

Here, the Plaintiff originally filed his complaint on April 29, 2002. (See Apr. 29, 2002 Compl.) In the more than three years that have passed [*14] since then, he has not identified the John Doe defendants and has therefore not served process upon them. This failure is not the result of lack of opportunity. Magistrate Judge Bloom extended the discovery deadline on several occasions to accommodate requests made by the Plaintiff. (See April 9, 2004 Order; Aug. 3, 2004 Order; Sept. 29, 2004 Order; October 18, 2004 Order.) The Plaintiff has had over three years, far more than the typical 120 day time period, to identify and serve the John Doe defendants, and the court is under no obligation to extend the deadline indefinitely. See Thomas v. Keane, 2001 U.S. Dist. LEXIS 4873, No. 99 Civ. 4302, 2001 WL 410095, at *1, *5 (S.D.N.Y. April 23, 2001) (dismissing claim under Rule 4(m) where the pro se plaintiff failed to serve John Doe defendants within roughly two years of filing complaint); Cammick, 1998 U.S. Dist. LEXIS 18006, 1998 WL 796452, at *1 (dismissing a claim under Rule 4(m) where the plaintiff failed to serve John Doe defendants within two years and five months of filing complaint); Waldo v. Goord, 1998 U.S. Dist. LEXIS 15956, No. 97-CV-1385, 1998 WL 713809, at *5 (N.D.N.Y. Oct. 1, 1998) (dismissing a claim under 4(m) where the pro se plaintiff failed to serve [*15] John Doe defendants within a year of filing his complaint). The court therefore dismisses without prejudice the claims against the unidentified defendants for lack of timely service.

*ii. Plaintiff's Motion to Compel*

In an effort to discover the identities of the John Doe defendants, the Plaintiff urges the court to compel the Defendants to respond to three previously made document requests. (Pl. Opp. at 6.) The court denies this motion. The Plaintiff's first document request was made orally, and the Defendants requested that it be put in writing. (McDermott Dep. at 13-14.) The Plaintiff did not object to the Defendants' request, nor has the Plaintiff provided evidence that he put this request in writing. (Defs. Reply at 5.) The Plaintiff's second document request was answered by the Defendants. (Defs. Sept. 13, 2004 letter.) With respect to the third document request, Magistrate Judge Bloom ordered that it need not be answered due to the request's untimeliness. (Magistrate Judge Bloom Oct. 18, 2004 Order.)

Although the Plaintiff has been given previous extensions and has been provided with ample opportunity to identify the John Doe defendants, he again seeks to extend the deadline [*16] for discovery. The court declines to do so. See Trebor Sportswear Co. v. The Limited Stores, Inc., 865 F.2d 506, 511 (2d Cir. 1989) (denying further discovery when the party opposing summary judgment had a "fully adequate opportunity for discovery"); see also Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 927 (2d Cir. 1985) (denying plaintiff's request to reopen discovery when plaintiff had "ample time in which to pursue the discovery that it now claims is essential"). Here, the Plaintiff himself failed to make one request in writing, made one untimely request, and has already received an answer to a third request. He has been given adequate time to conduct discovery and is not entitled to further extensions. Consequently, the court refuses to compel discovery of these documents.

*E. Adequacy of Service Upon Lieutenant Miller*

The Defendants also contend that claims against Lt. Miller should be dismissed on the grounds of failure to serve process. (Defs. March 4, 2005 Statement at 2.) The Plaintiff responds that due to the fact that the Plaintiff began this proceeding pro se and in forma pauperis, service upon Lt. [*17] Miller's should effectively be excused. (Pl. Resp. at 1.)

As explained above, a cause of action is subject to dismissal if a plaintiff has failed to serve a defendant with a summons and complaint within 120 days after filing the complaint. Fed. R. Civ. P. 4(m). While pro se litigants should be afforded a degree of latitude, they are nevertheless generally required "to inform themselves regarding procedural rules and to comply with them." LoSacco v. City of Middletown, 71 F.3d 88, 92 (2d Cir. 1995). Where a pro se plaintiff is confused about requirements detailed in Rule 4, the court may extend the 120-day deadline. Herrera v. New York Tel. Co., 1995

U.S. Dist. LEXIS 9444, 93 Civ. 2599, 1995 WL 405842, at *1 (S.D.N.Y. July 10, 1995). Nevertheless, courts may dismiss cases for failure of service after an appropriate amount of time. See Thomas, 2001 U.S. Dist. LEXIS 4873, 2001 WL 410095, at *1, *5 (dismissing pro se claim about two years after filing complaint); Waldo, 1998 U.S. Dist. LEXIS 15956, 1998 WL 713809, at *5 (dismissing pro se claim within a year of filing complaint).

Here, three years have passed since the Plaintiff filed his initial complaint. The failure [*18] to serve is not due to confusion concerning the service of process rule. Indeed, the Plaintiff properly served other defendants, and provided proof of such service to the court. (See, e.g., Aug. 8, 2002 Summons; March 25, 2003 Summons.) Furthermore, although the Plaintiff initially brought his case pro se, he has had the guidance of retained counsel for almost two years. (See Aug. 12, 2003 Notice of Appearance.) In that almost two-year period, however, there has been no showing that Lt. Miller was ever properly served. Cf. Herrera, 1995 U.S. Dist. LEXIS 9444, 1995 WL 405842, at *1 (refusing to dismiss case despite untimely service because the litigant began the case pro se but later retained counsel who promptly remedied the failure of service). Dismissal of claims against Lt. Miller for lack of service is therefore appropriate. [3]

> [3] It should be noted that the Plaintiff incorrectly argues that the Defendant bears the burden of proving Lt. Miller was never served. (Pl. Resp. at 1.) Because the Defendant has validly challenged the service of process, the burden shifts to the Plaintiff to prove that proper service was performed. Johnson v. Quik Park Columbia Garage Corp., 1995 U.S. Dist. LEXIS 5824, No. 93 Civ. 5276, 1995 WL 258153 at *1 n.2 (S.D.N.Y. May 2, 1995).

[*19] *F. 42 U.S.C. § 1983 Claims Against the City of New York*

The Defendants further maintain that the Plaintiff's § 1983 claims against the City of New York should be dismissed because the Plaintiff has failed to demonstrate that a municipal policy was the cause of the alleged violations. [4] (Defs. Mem. at 18.) Title forty-two U.S.C. § 1983 provides a cause of action against any person who, under color of state law, violates rights or privileges established under the Constitution or law of the United States. Local governments are considered a "person" for § 1983 purposes and can therefore be sued under the statute. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). However, a local government is not liable under § 1983 for injury which is merely the result of a government em-

ployee's conduct, but rather only when the injury at issue is the result of an adopted municipal policy or custom. Monell, 436 U.S. at 690; see also Coon v. Town of Springfield, 404 F.3d 683, 686 (2d Cir. 2005).

> [4] The Plaintiff does not directly address this argument in his opposition brief, but does contend that his § 1983 claims should not be dismissed even in the event that city officers may have qualified immunity. (Pl. Opp. at 21-22.) Additionally, he argues that the action should not be dropped because there are disputed facts which a jury ought to resolve at trial. (Id. at 22.)

[*20] *i. Failure to Train*

In his amended complaint, the Plaintiff alleges that New York City should be held liable for its failure to train its "uniformed members" properly. (Am. Compl. at 6.) The Supreme Court has held that a municipality may be held liable for failure to train its employees where it acts with "'deliberate indifference' to the rights of persons with whom the police come into contact." City of Canton, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989). The Second Circuit elaborates:

> City of Canton requires that plaintiffs establish not only that the officials' purported failure to train occurred under circumstances that could constitute deliberate indifference, but also that plaintiffs identify a specific deficiency in the city's training program and establish that that deficiency is "closely related to the ultimate injury," such that it "actually caused" the constitutional deprivation. Thus, the Supreme Court emphasized in City of Canton that plaintiffs must establish that "the officer's shortcomings . . . resulted from . . . a faulty training program" rather than from the negligent administration of a sound program or other unrelated circumstances.

[*21] Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 129 (2d. Cir. 2004) (citing Canton, 489 U.S. at 390-91). Here, even when specifically called upon to support his § 1983 claim against the city, the Plaintiff has provided no evidence of a specific deficiency in New York City's training program or the deficiency's close relationship to his injury. The court therefore dismisses the Plaintiff's § 1983 claim concerning the City's alleged failure to properly train its employees.

*ii. Failure to Supervise*

In his amended complaint, the Plaintiff also argues that New York City failed to properly supervise its "uniformed members." (Pl. Am. Compl. at 6.) To survive summary judgment, a claim for failure to supervise must also be supported by evidence of a municipal policy or custom which caused the injury. Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995). In a failure to supervise case, a plaintiff must typically establish that "a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was 'obvious,' and the policymaker's failure to [*22] investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction." Amnesty America, 361 F.3d at 128 (citations and quotations omitted).

Here, the Plaintiff has provided no evidence that a policymaking official had notice of a potentially serious problem of constitutional conduct, that the need for corrective supervision was obvious, or that any inaction was due to deliberate indifference. In short, the Plaintiff has provided no evidence to prove a required element for a valid § 1983 claim against the City of New York. Consequently, the court must dismiss the Plaintiff's claim alleging New York City's failure to supervise.

## G. Claims Against Lt. McDermott

### i. Identification of Lieutenant McDermott

The Defendants assert that the Plaintiff's claims against Lt. McDermott must be dismissed because there is doubt as to whether the Plaintiff has properly identified him. (Defs. Mem. at 10.) Specifically, they argue that there are inconsistencies in the record which suggest that the Plaintiff may have misidentified Lt. McDermott as the person who allegedly struck the Plaintiff with his fist and with his [*23] helmet. (Id.) The Plaintiff, however, contends that he sufficiently identified Lt. McDermott, and that the claim against him should therefore not be dismissed on summary judgment. (Pl. Opp. at 2-4.)

For summary judgment purposes, the court resolves all ambiguities and draws all inferences in favor of the non-moving party. Schwabenbauer v. Board of Education, 667 F.2d 305, 313 (2d Cir. 1981). Here, the Plaintiff alleges that he was struck twice. (Petway Dep. at 71, 82-83.) He believed that his assailant was "approximately" five feet ten inches tall and that he was no taller than six feet. (Id. at 66.) A witness, who testified that a fireman struck the Plaintiff, did not remember distinctly how tall the person was who struck the Plaintiff, but indicated that he was about six feet ten inches tall while wearing a helmet. (Lyons Dep. at 34-36.) Lt. McDermott is five feet seven and a half inches tall. (McDermott Aff. at 1.) Thus, because the Plaintiff and a witness believe the alleged tortfeasor to be taller than Lt. McDermott actually is, the Defendants urge the court to dismiss the case against Lt. McDermott. The court declines to do so.

The court must draw all [*24] inferences in the Plaintiff's favor, and it is reasonable to infer that the Plaintiff and witness could have misjudged Lt. McDermott's height. First, the Plaintiff believed his tortfeasor to be only two and a half inches taller than Lt. McDermott actually is, a relatively minimal and easily mistakable difference. Second, the alleged tortfeasor was wearing his helmet and, presumably, his boots, and these articles of clothing would have made him appear taller than he was. Third, the Plaintiff and witness were not in a situation where they had the opportunity to carefully observe the alleged's tortfeasor's exact measurements. Thus, viewing the facts in the light most favorable to the Plaintiff, the court denies the Defendants' motion to dismiss the cause of action against Lt. McDermott on account of the inaccurate assessments of Lt. McDermott's height.

### ii. Excessive Force

As an alternative argument, the Defendants urge that even if the Plaintiff sufficiently identified Lt. McDermott, the Lieutenant's acts were reasonable in light of the circumstances and therefore did not violate Plaintiff's constitutional rights. [5] (Defs. Mem. at 11.) The Plaintiff counters that Lt. McDermott [*25] did not act reasonably, and asserts additionally that the reasonableness of McDermott's acts should in any event be resolved by a trier of fact. (Pl. Opp. 8-12.)

> 5  They also argue that the broken nose may not have been caused by Lt. McDermott. Specifically, they conjecture that the Plaintiff may have broken his nose when he fell on the stairs of his building. (Defs. Mem. at 11.) They note, in addition, that the Plaintiff was not treated for a broken nose while at the hospital. (Defs. Mem. at 11-12.) The Plaintiff testified, however, that Lt. McDermott struck his nose so hard that the Plaintiff's nose began to bleed, causing blood to pour "all over" his pants and shirt. (Petway Dep. at 85.) In addition, a hospital report two days after the event indicated that the Plaintiff had "bilateral comminuted nasal bone fractures." (See Feb. 1, 2001 New York Presbyterian Hospital Diagnosis at 1.) In light of this testimony and information, the court cannot find that there is no disputed issue of fact as to whether the Plaintiff's nose was broken. In any event, even if the Plaintiff's nose was not broken, Lt. McDermott's alleged striking of the Plaintiff, while the Plaintiff was handcuffed, restrained, and unthreatening, would nevertheless constitute an unreasonable and excessive use of force.

2005 U.S. Dist. LEXIS 37783, *

[*26] The Fourth Amendment protects against "unreasonable" seizures. See Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). "The 'reasonableness' of a particular seizure depends not only on *when* it was made, but also on *how* it is carried out." Id. (emphasis in original). Thus a plaintiff can "prevail on his excessive force claim if he is able to show that [a government officer] used more force than was necessary to subdue him." [6] Curry v. City of Syracuse, 316 F.3d 324, 332 (2d Cir. 2003). Determining whether a particular seizure was reasonable is a fact-intensive process, requiring careful consideration of the facts and circumstances of the particular case, including the severity of the crime and the dangerousness of the suspect. Graham, 490 U.S. at 395. The officer's actions also must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 395; see also Saucier v. Katz, 533 U.S. 194, 205, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001) (citing Graham). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, [*27] violates the Fourth Amendment." Graham, 490 U.S. at 397. In an excessive force case, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397; see also Saucier, 533 U.S. at 204-5 (citing Graham).

6  Although the Fourth Amendment was primarily directed at restraining unreasonable searches and seizures conducted by the police, the Amendment also imposes restraints upon civil authorities, including firefighters. New Jersey v. T.L.O., 469 U.S. 325, 335, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985) ("The [Supreme] Court has long spoken of the Fourth Amendment's strictures as restraints imposed upon 'governmental action' -- that is, 'upon the activities of sovereign authority.' Accordingly, we have held the Fourth Amendment applicable to the activities of civil as well as criminal authorities....") (citations omitted); see also Michigan v. Clifford, 464 U.S. 287, 293, 104 S. Ct. 641, 78 L. Ed. 2d 477 (1984) (applying Fourth Amendment restraints to firefighters).

[*28] The facts of this case, viewed in the light most favorable to the non-moving party, unfold as follows. The Plaintiff escaped from a burning building, and emerged injured and very concerned about his three dogs that remained trapped inside. (Am. Compl. at 2-3.) Firefighters eventually arrived, and the Plaintiff approached Chief Hickey to ask about efforts being made to save his dogs. (Id. at 7) Although the Plaintiff was assured his dogs would be rescued, he asked Chief Hickey a second

time after no efforts were made to do so. (Am. Compl. at 3; Petway Dep. at 63-64.) Chief Hickey then verbally reprimanded the Plaintiff to move away and two firemen began shoving him. (Id. at 64-65.) As the Plaintiff protested being shoved, he was again verbally reprimanded, at which point Lt. McDermott took off his helmet and struck the Plaintiff in the head with it. (Id. at 72-74.) The Plaintiff's hands were still at his side when he was struck. (Id. at 74.) Officer Barone then handcuffed the Plaintiff's wrists tightly behind his back. (Id. at 80.) While handcuffed, Lt. McDermott struck the Plaintiff again, this time in the face and with such force that it may have broken his nose. [*29] (Id. at 83.)

When one considers this scenario from an on-the-scene perspective, Lt. McDermott's use of force was clearly excessive. Lt. McDermott allegedly struck the Plaintiff in his head with a helmet even though the Plaintiff's arms were at his sides and seemingly posed no physical threat. Plaintiff's wrists were then securely handcuffed behind his back. Thus restrained, the Plaintiff appeared to be of no danger to himself or to others. Nor is there any indication that the Plaintiff was trying to escape. Nevertheless, while the Plaintiff was restrained and in this vulnerable position, Lt. McDermott allegedly punched him in the face so forcefully that it broke the Plaintiff's nose. Viewed in this light, the facts indicate the use of unreasonable force in violation of the Plaintiff's Fourth Amendment rights, and thus Plaintiff's excessive force claim will not be dismissed on summary judgment.

### iii. Qualified Immunity

The Defendants argue, in addition, that Lt. McDermott should be entitled to qualified immunity since he reasonably believed his actions to be lawful. (Defs. Memo. at 12-13.) They maintain that a reasonable officer "could have believed that exerting some force [*30] to remove the plaintiff from the scene was an appropriate response in these circumstances." (Defs. Mem. at 13.) Where a defendant claims qualified immunity, and moves for summary judgment on this ground, the court engages in a two step analysis. Saucier, 533 U.S. at 201. The initial inquiry is whether, viewed in the light most favorable to the injured party, the facts alleged demonstrate that the officer's conduct violated a constitutional right. Id. If there has been no constitutional violation made out on the alleged facts, the inquiry ends. If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Id. If a right has not been clearly established, then an official, acting unconstitutionally, is not on notice that his conduct is unlawful. Id. at 202. In the absence of such notice, summary judgment based on qualified immunity is appropriate. Id.

As described above, the facts alleged indicate that Lt. McDermott used excessive force and thus violated the Fourth Amendment. The court, therefore, proceeds to the second step of the [*31] Saucier analysis and asks whether this violated right was clearly established. There can be no doubt that the right to be free from excessive use of force was clearly established at the time of the incident. See, e.g., Graham, 490 U.S. at 395 (explaining the standard to be used to determine whether a government official used excessive force). Striking the Plaintiff while he was handcuffed, restrained, and unthreatening was unlawful conduct given the circumstances, and that it was excessive "would [have been] clear to a reasonable officer." Saucier, 533 U.S. at 202. Consequently, Lt. McDermott does not have qualified immunity with regard to his alleged striking of the Plaintiff.

### iv. Participation of Other Officials

The Defendants urge the court, in addition, to dismiss on summary judgment any claims against Chief Hickey, Officer Barone, and Sgt. Motolla with regard to this alleged striking. Specifically, the Defendants argue that the Plaintiff fails to allege any participation of these three officials, and that it would therefore be appropriate to dismiss claims against them.

A plaintiff must, at minimum, allege that he suffered an injury [*32] by a defendant for his claim against that defendant to survive summary judgment. Wachtler v. County of Herkimer, 35 F.3d 77, 82 (2d Cir. 1994); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). Here, the Plaintiff has not alleged that Chief Hickey, Officer Barone, or Sgt. Motolla participated in Lt. McDermott's alleged use of excessive force. Therefore, the claims against Chief Hickey, Officer Barone, and Sgt. Motolla are dismissed.

### H. False Arrest Claims

The Defendants argue that the court should dismiss the Plaintiff's false arrest claims on the grounds that the Plaintiff was never formally arrested. [7] (Defs. Memo. at 15.) The Plaintiff, however, argues that a person need not be actually arrested to state a valid claim of false arrest. (Pl. Opp. at 18.) Specifically, he argues that he was placed in a position where a reasonable person would not have felt free to leave and that this deprivation of freedom was sufficient to state a false arrest claim. (Id.)

7   It is unclear whether the Defendants seek a dismissal of false arrest claims brought under state tort law or of false arrest claims brought under § 1983 for a violation of the Plaintiff's Fourth Amendment rights. In any event, dismissal is justified in neither situation.

[*33]   A cause of action for false arrest can be brought either as a violation of state tort law or as a violation of § 1983 based on an unreasonable seizure under the Fourth Amendment. See, e.g., Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003). For neither cause of action is formal arrest a necessity. For the state law tort claim, [8] a plaintiff must show that the defendant intended to confine the plaintiff, the plaintiff was conscious of the confinement, the plaintiff did not consent to the confinement, and the confinement was not otherwise privileged. Id. Significantly, "there is no requirement under New York law that an arrest be in any sense formal." Posr v. Doherty, 944 F.2d 91, 96 (2d Cir. 1991); see also People v. Hicks, 508 N.Y.S.2d 163, 166, 68 N.Y.2d 234, 500 N.E.2d 861 (1986) ("Even without a technical formal arrest, a suspect's detention may in fact be the equivalent of an arrest...."); People v. Chestnut, 51 N.Y.2d 14, 409 N.E.2d 958, 431 N.Y.S.2d 485, 489 (1980) ("When the intrusion involved is of sufficient magnitude, an 'arrest' will be said to occur whether or not the person is eventually transported to the police station and charged with a crime."). To determine [*34] whether a person has been arrested, the court considers whether a reasonable man, innocent of any crime, would have thought he was arrested. People v. Hicks, 508 N.Y.S.2d at 166 (citing People v Yukl, 25 N.Y.2d 585, 589, 256 N.E.2d 172, 307 N.Y.S.2d 857 (1969)).

8   Under the doctrine of supplemental jurisdiction, a federal district court can hear a state tort law false arrest claim. See e.g., Rodriguez v. Phillips, 66 F.3d 470, 482 (2d Cir. 1995). The court may preside over a pendent state-law claim which shares the same set of facts as a claim over which the court has original jurisdiction. Lyndonville Sav. Bank & Trust Co. v. Lussier, 211 F.3d 697, 704-05 (2d Cir. 2000) (explaining that state-law false arrest claim must share with the federal-law claim "a common nucleus of operative fact" for the court to hear the state-law claim by means of supplemental jurisdiction)

Similarly, a plaintiff need not show that there was a formal arrest to state a valid § 1983 claim. Arrest [*35] is the "quintessential seizure of the person." Posr, 944 F.2d at 97 (citing California v. Hodari D., 499 U.S. 621, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991)). However, a person need not be formally arrested to be seized in violation of the Fourth Amendment. Id. at 97. Under constitutional standards, a person is seized "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Id. at 99 (finding that even without a formal arrest, a plaintiff was sufficiently "arrested" and "seized" for false arrest and § 1983 purposes when an officer "slammed" the plaintiff against a wall); Green v. City of

New York, No. 01 Civ. 1996, 2004 U.S. Dist. LEXIS 5, at *32-33 (S.D.N.Y. Jan. 5, 2004) ("There is no doubt that Mr. Green's transport to the hospital against his wishes was a 'seizure' within the meaning of the Fourth Amendment.").

In this case, although the Plaintiff was never formally arrested, his wrists were tightly handcuffed behind his back and he was struck in the head and face. (Petway Dep. at 79-80, 83, 112.) Furthermore, the Plaintiff was informed that he would be transported [*36] to the hospital against his will, perhaps even tranquilized. (Id.) Defendants point out that the Plaintiff was only handcuffed for several minutes, but a seizure may be effected for the purposes of the Fourth Amendment even when an officer "briefly detains an individual and restrains that person's right to walk away." United States v. Moreno, 897 F.2d 26, 30 (2d Cir. 1990). A reasonable person, in the Plaintiff's situation, could reasonably have believed that he was not free to leave. Thus, the Plaintiff's false arrest claims will not be dismissed merely because the Plaintiff was not formally arrested.

*I. Right to Refuse Medical Treatment*

The Plaintiff has argued that he was denied the right to refuse medical treatment. The Defendants contend that this claim should be dismissed because the Plaintiff consented to go to the hospital. (Defs. Memo. at 15.) They argue, in addition, that even if he did not go voluntarily, the claim should be dismissed because the EMS could have transported him to the hospital without his consent. (Id. at 15-16.) The Plaintiff responds that his injuries were not so severe as to justify taking him to the hospital without his [*37] consent, and that he did not submit voluntarily to hospitalization, but rather was coerced to do so. (Pl. Opp. at 19.) Because the court finds that the EMS could have transported the Plaintiff without his consent, the court need not decide whether the Plaintiff consented to this transportation.

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." The Supreme Court has interpreted this Amendment to mean that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment...." Cruzan v. Director, Missouri Dep't of Health, 497 U.S. 261, 278, 110 S. Ct. 2841, 111 L. Ed. 2d 224 (1990). The right to refuse medical treatment "does not rest upon 'a general and abstract right to hasten death, but on well-established, traditional rights to bodily integrity and freedom from unwanted touching.'" Blouin v. Spitzer, 356 F.3d 348, 360 (2d Cir. 2004) (citing Vacco v. Quill, 521 U.S. 793, 807, 117 S. Ct. 2293, 138 L. Ed. 2d 834 (1997)). This right is "squarely grounded in the act of consent: Everyone, regardless of physical condition, is entitled, *if competent,* to refuse unwanted lifesaving [*38] medical treatment." Blouin, 356 F.3d at 360 (citations and quotation marks omitted) (emphasis in original).

However, the state has an interest in protecting and preserving the lives of its citizens. Green, 2004 U.S. Dist. LEXIS 5, at *34. Therefore, when an officer reasonably concludes that an individual cannot make a competent judgment, or that the official would very likely expose himself to potential liability if he does not transport the individual to a hospital, that officer may force the injured individual to receive medical treatment even against that individual's will. See Green, 2004 U.S. Dist. LEXIS 5, at *36-37; see also Vazquez v. Marciano, 169 F. Supp. 2d 248, 253 (S.D.N.Y. 2001).

In Green v. City of New York, for example, a woman called for emergency medical assistance because she believed that her husband could not breathe. Green, 2004 U.S. Dist. LEXIS 5, at *35. At least one of the medical officers, after his arrival on the scene, believed that the husband was dying and that he would have to go to the hospital to survive. Id. The husband, who could communicate only through [*39] blinking and through a computer, expressed to his wife that he did not wish to go to the hospital, and she communicated this message to the medical officers; however, the technicians transferred him to the hospital in spite of his wishes. Id. at *3, *15-*16. The court found that it was reasonable for the emergency medical officials to transport the plaintiff to the hospital against his will, and the court therefore refused to impose liability on the officials for their conduct. Specifically, the court reasoned that "the crisis atmosphere would have caused the officers to conclude that this was not a setting in which [the plaintiff] could make an informed and competent decision regarding his treatment," and that the officers would have exposed themselves to potential liability had they not transported the plaintiff to the hospital given the "extreme danger" of his medical condition. Id. at *36-*38.

The court in Vazquez v. Marciano came to a similar conclusion. In that case, the plaintiff had been in a serious car accident. Vazquez v. Marciano, 169 F. Supp. 2d 248, 250 (S.D.N.Y. 2001). Plaintiff's car hit a tree, causing him to momentarily black out and [*40] rendering his passenger unconscious and trapped inside the vehicle. Id. at 250, 253. When officers arrived, the plaintiff tried to evade them. Id. at 250. Once apprehended, the plaintiff was taken to the hospital against his express wishes. Id. at 250-51. When the plaintiff sued the officer for forcing him to undergo medical treatment, the court determined that the officers were entitled to qualified immunity because the officers had acted in an objectively reasonable manner. Id. at 253. Specifically, the court reasoned that the plaintiff could not have made a rational decision because he was inebriated and because of the

crisis atmosphere. See id. Furthermore, it was reasonable for the officer to transport the plaintiff to the hospital because, given the plaintiff's injuries, the officer would have been exposed to liability had he not transported the plaintiff. Id.

In the present case, interpreted in the light most favorable to the Plaintiff, the facts suggest that a conclusion similar to that in Green and Vazquez is appropriate. A fire "was raging out of control" at the Plaintiff's residence. (Pl. [*41] Am. Comp. at 2.) In his escape from the fire, the Plaintiff burned the left side of his face, his left ear, his right hand, and four of his fingers. (Id. at 2.) Later, the Plaintiff was struck, allegedly so hard that his nose was broken and there was blood "all over" the Plaintiff's pants and shirt. (Petway Dep. at 83-85.) The Plaintiff then received medical attention from Lt. Miller, an EMS official, who testified that she believed that if the Plaintiff was not treated at a hospital, he could have lost a limb or even his life. (Miller Dep. at 25.) The Plaintiff repeatedly refused to go to the hospital and was repeatedly told that he could and would be taken against his will if it was determined that his life was at risk. (Id. at 86-88.) Eventually, he agreed to go to the hospital. (Id. at 5.) He ultimately was treated at the hospital's burn unit for over two weeks. (Pl. Dep. at 95.)

In this case, as in the Green and Vazquez cases, there was an emergency "crisis" situation. Notably, while the plaintiff in Green was hospitalized for five days, the Plaintiff here was injured to the extent that he needed over two weeks hospitalization. Similarly, the officers [*42] in this case, like those in Green and Vazquez, could reasonably have believed that they would have exposed themselves to legal liability if they had permitted the Plaintiff to refuse medical treatment. A person's right to refuse medical treatment must be balanced with the state's interest in preserving the lives and safety of its citizens. Imposing liability in such a situation as this would impermissibly discourage medical professionals from performing their life-saving functions. See Green, 2004 U.S. Dist. LEXIS 5, at *36-37 ("The state also has an interest in protecting its employees from liability for decisions such as the one in this case; imposing liability in this circumstance could cause future decision makers to err on the side of leaving critically ill patients without professional medical assistance.")

It should further be noted that the Plaintiff has failed to provide the court with any case law in support of this Fourteenth Amendment claim. He has provided no case in which a seriously injured person, forced to accept medical treatment under crisis conditions, collected damages arising from the Fourteenth Amendment right to refuse medical treatment. [*43] Therefore, given the crisis situation, the Plaintiff's serious injuries, the lack of supporting relevant case law, and the underlying policy considerations, the court finds that the Defendants did not violate the Plaintiff's Fourteenth Amendment right to refuse medical treatment.

Notwithstanding that the Plaintiff's Fourteenth Amendment right was violated, the Defendants are nonetheless immune from liability here. As noted above, the court engages in a two-step analysis when it seeks to determine whether a municipal employee should be protected by qualified immunity against a § 1983 claim. Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). In the first step, the court determines whether a constitutional right was violated. Id. In the second step, the court determines whether that right was clearly established, considering the particular circumstances of the case. Id. Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986); see also Luna v. Pico, 356 F.3d 481, 490 (2d Cir. 2004).

Assuming, arguendo, that the Plaintiff's [*44] Fourteenth Amendment rights were violated, it cannot be said that the Defendants acted in an unreasonable manner when they forced him to accept medical treatment, especially considering the fact that the Plaintiff was so severely burned that he required over two weeks of hospitalization, that one EMS official believed that his life was at risk, and that the Plaintiff's decision-making process may have been impaired by the crisis atmosphere. Given these circumstances, Lt. Miller and Sgt. Motolla acted in an objectively reasonable fashion. See Luna, 356 F.3d at 490 ("Even assuming a state official violates a plaintiff's constitutional rights, the official is protected nonetheless if he objectively and reasonably believed that he was acting lawfully.") The Plaintiff's right to refuse medical treatment under these conditions was therefore not clearly established. Even if the Defendants did violate his Fourteenth Amendment rights, they are nevertheless protected under the doctrine of qualified immunity.

## IV. Conclusion

For the foregoing reasons, the Defendants' motion for summary judgment is granted in part and denied in part. Defendants' motion for summary judgment [*45] is GRANTED with respect to the following: claims against NYPD, FDNY, EMS; claims against Officer Grau; claims against Lt. Miller and the two unidentified firemen; § 1983 claims for verbal abuse; § 1983 claims against the City of New York; claims against Chief Hickey, Officer Barone, and Sgt. Motolla concerning the alleged striking of the Plaintiff by Lt. McDermott; and the Plaintiff's claim of a Fourteenth Amendment violation of the right to refuse medical treatment. The afore-

2005 U.S. Dist. LEXIS 37783, *

mentioned claims are dismissed. Defendants' motion for summary judgment is DENIED with respect to the following: claims against Lt. McDermott for excessive use of force and Plaintiff's false arrest claims. In addition, Plaintiff's motion to compel discovery is denied.

The parties are instructed to contact Magistrate Judge Bloom to prepare a pre-trial order.

SO ORDERED.

Dated: September 2, 2005

Brooklyn, N.Y.

Nicholas G. Garaufis

United States District Judge

LEXSEE

**LATISHA MERCEDES and RUBEN MERCEDES, by their mother and natural guardian ANDREA BROWN and ANDREA BROWN, individually, Plaintiffs, -against- SHEILA E. BLUE, individually and as caseworker, ELAINE GROVER, individually and as caseworker; MARTHA MARCANO, individually and as supervisor; ALMA POE-REID, individually and as manager; NICHOLAS SCOPPETTA, individually and as Commissioner, VICENTE MATIAS, individually and as officer; MICHAEL BLOCK, individually and as detective; ROBERT FOX, individually and as detective; "JOHN DOE," individually and as sergeant; HOWARD SAFIR, individually and as Commissioner, "ROBERT" ORTIZ, individually and as caseworker; "JANE ROE," individually and as supervisor; NEW YORK FOUNDLING HOSPITAL; and CITY OF NEW YORK, Defendants.**

00 Civ. 9225 (RMB)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2004 U.S. Dist. LEXIS 19617**

**September 29, 2004, Decided**
**September 30, 2004, Filed**

**PRIOR HISTORY:** Mercedes v. Blue, 2001 U.S. Dist. LEXIS 6468 (S.D.N.Y., May 16, 2001)

**DISPOSITION:**     [*1]  Defendants' Motion for summary judgment granted in part and denied in part.

**COUNSEL:** For Latisha Mercedes, Ruben Mercedes, Andrea Brown, Plaintiffs: Carolyn A. Kubitschek, LEAD ATTORNEY, Lansner & Kubitschek, New York, NY.

For Sheila E. Blue, Elaine Glover, Martha Marcano, Alma Poe-Reid, Nicholas Scopetta, Vicente Matias, Michael Block, Robert Fox, Howard Safir, City of New York, Defendants: Isaac Klepfish, LEAD ATTORNEY, Corporation Counsel of the City of New York, New York, NY.

For Elaine Glover, Martha Marcano, Alma Poe-Reid, Nicholas Scopetta, Vicente Matias, Howard Safir, Defendants: Isaac Klepfish, Corporation Counsel of the City of New York, New York, NY.

**JUDGES:** RICHARD M. BERMAN, U.S.D.J.

**OPINION BY:** RICHARD M. BERMAN

**OPINION**

*DECISION & ORDER*

**I. Introduction**

On or about December 5, 2000, Andrea Brown ("Brown"), filed a complaint ("Complaint") on behalf of herself and her infant children, Latisha and Ruben Mercedes (collectively, "Plaintiffs"), alleging, among other things, that Sheila E. Blue ("Blue"), individually and as a New York City Administration for Children's Services ("ACS") caseworker; Elaine Grover ("Grover"), individually and as an ACS caseworker; [*2] Martha Marcano ("Marcano"), individually and as an ACS supervisor; Alma Poe-Reid ("Poe-Reid"), individually and as an ACS manager; Nicholas Scoppetta ("Scoppetta"), individually and as Commissioner of ACS (collectively, "ACS Defendants"); Vicente Matias ("Matias"), individually and as a New York Police Department ("NYPD") officer; Michael Block ("Block"), individually and as an NYPD detective; Robert Fox ("Fox"), individually and as an NYPD detective; "John Doe" ("Doe"), individually and as an NYPD sergeant; Howard Safir ("Safir"), individually and as Commissioner of the NYPD (collectively, "NYPD Defendants"); and the City of New York (collectively, with ACS Defendants and NYPD Defendants, "Defendants") violated Plaintiffs' "rights secured to them under the Fourth and Fourteenth Amendments of the United States Constitution" because

"Defendants [i] arrested and incarcerated [Brown] without probable cause ...; [ii] maliciously prosecuted [Brown] in the Criminal Court and [in] the Family Court; [and iii] removed the infant plaintiffs from the care and custody of [Brown], and held the infant plaintiffs without probable cause for nine days." Complaint P 1. [1] Plaintiffs also [*3] assert claims under New York State law for false arrest and malicious prosecution. Complaint P 1.

> 1   The Complaint also named Robert Ortiz, Jane Roe and the New York Foundling Hospital as defendants ("Agency Defendants"). The Agency Defendants were dismissed on May 7, 2001 following a settlement. *See* Order, dated May 7, 2001, signed by Magistrate Judge Michael H. Dolinger.

On or about June 11, 2002, Defendants moved for summary judgment ("Defs' Motion"), accompanied by a memorandum of law ("Defs' Memo") arguing, among other things, that Plaintiffs' claims should be dismissed because (i) "the Court lacks subject matter jurisdiction under the *Rooker-Feldman* doctrine, [over] ... plaintiffs' claims [challenging the removal of Ms. Brown's children and proceedings in Family Court] insofar as they require this Court to review the Family Court determinations;" (ii) "emergency circumstances justified [the children's] removal ... without a prior hearing;" (iii) "the circumstances requiring the children's [*4] removal provided probable cause for Brown's arrest and [criminal] prosecution ... as well as for the proceedings against her in Family Court;" (iv) "the individual defendants are protected by qualified immunity;" and (v) "the state law claims for false arrest and malicious prosecution must also be dismissed because of the existence of probable cause for defendants' conduct. In addition, the state false arrest claim must be dismissed because of plaintiffs' failure to file a Notice of Claim or comply with with the one-year-and ninety-day statute of limitations." Defs' Memo at 2-3. On or about August 8, 2002, Plaintiffs opposed Defendants' Motion ("Pls' Memo") and on or about August 26, 2002, Defendants submitted a reply ("Reply"). **For the reasons set forth below, Defendants' Motion is granted in part and denied in part.**

**II. Background**

On Saturday, December 6, 1997, at approximately 2:00 p.m., Police Officer Matias arrived at Plaintiffs' apartment, at 2134 Amsterdam Avenue in Manhattan, where Brown lived with her two biological children, Latisha and Ruben Mercedes (then ages 11 and 10), and two foster children, Barry Roberts (then age 3) and Brandi Trusty (then age 1), in [*5] response to a 911 call placed at approximately 1:47 p.m. which indicated that "there are 4 kids alone ... babysitter at location ... mother is at work ... possible child neglect ... 2-3 of the children

at the location are ill ... send EMS to location ..." Affidavit of Vincente Matias, dated June 2002 ("Matias Aff."), at 2; City Defendants' Statement Pursuant to Rule 56.1 ("Defs' 56.1 Stmt") PP 12-13; Plaintiffs' Rule 56.1 Statement ("Pls' 56.1 Stmt") PP 12-13. Upon his arrival, Officer Matias was allowed into Plaintiffs' apartment by Helena Grier ("Grier"), a babysitter, and he observed "that the ... home was in total disarray .... I also noticed four children were left alone ... I also smelled urine and noticed pillows on the floor with urine on them." Matias Aff. 5-6; Defs' 56.1 Stmt PP 16-19. [2] Grier "advised [Matias] that she had been the babysitter for Mrs. Brown since about November 12, 1997 [and] ... had quit on December 5, 1997 and advised Mrs. Brown ... that she would not be at the Brown home to babysit on December 6, 1997 .... On December 6, 1997 ... at about 10:00 a.m .... [Grier] received a phone call [at home] from Mrs. Brown, who was at work, requesting that [*6] ... Grier babysit for the children who were alone." Matias Aff. PP 11-13; *see* Affidavit of Helena Grier, dated May 31, 2002 ("Grier Aff.") P 10; Defs' 56.1 Stmt PP 30, 32-34; Pls' 56.1 Stmt PP 30, 32-34. [3] Grier informed Officer Matias that "this was not the first time the children had been left alone ... Brown would leave for work approximately at 5:30 a.m. and Ms. Grier would arrive ... at approximately 7:30 a.m." Matias Aff. P 13; Defs' 56.1 Stmt P 31; Pls' 56.1 Stmt P 31. As a result of Officer Matias' observations and examinations of the children by EMS personnel, which revealed that "Barry ... was congested .... Brandy ... was congested and had been coughing .... Ruben ... had stomach pains .... [and] Brandy had thrown up .... EMS personnel removed the children to Columbia Presbyterian Hospital for further examination." Matias Aff. PP 9, 10; Defs' 56.1 Stmt PP 24-28; Pls' 56.1 Stmt PP 25, 28.

> 2   Brown asserts that when she left for work, "her apartment was clean. It was fairly neat, except that a closet rod had fallen in the closet in the room where Latisha slept and ... there were clothes on the floor of the closet." Plaintiff's Additional Facts, dated August 8, 2002 ("Pls' Facts"), P 99; *see* Declaration of Andrea Brown, dated August 8, 2002 ("Brown Dec."), P 23.

[*7]

> 3   Brown asserts that she had "asked Helena Grier to finish out the week that I had paid for or return some of the money and she said that she would finish out the week babysitting." Brown Dec. PP 18-19.

Following the removal of the children, Officer Matias "called the New York State Central Register hotline to file a report of a 'suspected child abuse and neglect.'" Matias Aff. P 16; Defs' 56.1 Stmt P 37; Pls' 56.1 Stmt P 37. Two parallel investigations ensued: the first by the

New York City Police Department conducted by Officer Matias and Detectives Fox and Block, "to determine whether Mrs. Brown had committed a crime by leaving the children alone;" the second was a "child protective investigation conducted by ACS ... to determine whether Mrs. Brown's conduct amounted to child abuse and neglect." Defs' 56.1 Stmt PP 39, 40, 41; Pls' 56.1 Stmt PP 40, 41.

In conducting his investigation on December 6, 1997, Officer Matias "called Ms. Brown at work and requested that she come to the precinct." Matias Aff. P 17; Defs' 56.1 Stmt P 42; Pls' 56.1 Stmt P 42. Ms. Brown came to the precinct that day [*8] and gave a statement to Detectives Block and Fox. Affidavit of Robert M. Fox, dated May 28, 2002 ("Fox Aff."), PP 9, 10; Exhibit C to Fox Aff.; Defs' 56.1 Stmt PP 45, 50, 51; Pls' 56.1 Stmt PP 45, 50, 51. Also on December 6, 1997, after the children's removal, Detectives Block and Fox, who "had four years of experience in child abuse cases," Defs' 56.1 Stmt P 44, interviewed Grier and Latisha and Ruben Mercedes and examined photographs of Plaintiffs' apartment taken by Matias on December 6, 1997. Fox Aff. PP 5, 6; Defs' 56.1 Stmt PP 45, 46; Pls' 56.1 Stmt P 45. These interviews, as well as Brown's time records from work, led Detectives Fox and Block and Officer Matias to "believe that the four children had all been left alone for an unreasonable amount of time." Fox Aff. P11; Matias Aff. P 20; Defs' 56.1 Stmt P 56. Based on this determination, Brown was arrested on December 6, 1997 and charged with Endangering the Welfare of a Child in violation of New York Penal Law § 260.10. Defs' 56.1 Stmt P 57; Pls' 56.1 Stmt P 57.

"Between December 6, 1997 and July 28, 2000, Andrea Brown made numerous court appearances in the Criminal Court while she was being prosecuted [*9] for the crime of Child Endangerment .... On July 28, 2000, Andrea Brown's criminal case was dismissed by the Criminal Court" upon the request of the Assistant District Attorney pursuant to New York's speedy trial statute, CPL § 30.30. Pls' 56.1 Stmt PP 150-51; see Record of Court Action before Judge Judith A. Levin, dated July 28, 2000, Exhibit 19 to Declaration of Christopher Weddle, dated August 8, 2002 ("Weddle Dec."), at 8 ("Dismissed Action A.D.A. [pursuant to CPL §] 30.30.").

As part of the ACS investigation, on December 6, 1997, caseworkers "spoke to Officer Matias who advised them of what he had seen and what he had been told by Ms. Grier" and concluded "that the children had been left alone and unsupervised, and the home was unsanitary and a possible health hazard to the children .... and made the emergency removal of all four children from Mrs. Brown's custody" on December 6, 1997 pursuant to Family Court Act § 1024. [4] Defs' 56.1 Stmt PP 60-61; Pls' 56.1 Stmt PP 60-61. On December 9, 1997, caseworker

Sheila Blue filed a neglect petition ("Petition") in Family Court, Borough of Manhattan. Affidavit of Sheila Blue, dated May 29, 2002 ("Blue Aff."), PP 7, 8; Defs' [*10] 56.1 Stmt P 64; Pls' 56.1 Stmt P 64; see Petition, dated December 9, 1997, Exhibit A to Blue Aff., at 4 (Ruben and Latisha Mercedes "are neglected children whose physical, mental, and/or emotional conditions have been impaired or is in imminent danger of becoming impaired as a result of the failure of their mother Andrea Brown to exercise a minimum degree of care in providing the children with proper supervision and care ..."). Also, on December 9, 1997, Brown appeared in Family Court and was assigned counsel, David Goldstein, and Family Court Judge Sara P. Schechter "granted the petition and remanded the children to the custody of the Commissioner of ACS" and, at Brown's request, scheduled a December 12, 1997 hearing ("December 12 Hearing") pursuant to Family Court Act § 1028. [5] Blue Aff. P 9; Defs' 56.1 Stmt PP 65-67; Pls' 56.1 Stmt PP 65-67; see Order, dated December 9, 1997, Exhibit B to Blue Affidavit ("December 9, 1997 Order"), at 1-2.

4    Family Court Act § 1024 provides that "[a] designated employee of a city ... department of social services shall take all necessary measures to protect a child's life or health including, when appropriate, taking or keeping a child in protective custody ... without an order and without the consent of the parent ... if (i) such person has reasonable cause to believe that the child is in such circumstance or condition that his continuing in said place of reidence or in the care and custody of the parent ... presents an imminent danger to the child's life or health; and (ii) there is not enough time to apply for an order ...".

[*11]

5    Family Court Act § 1028 provides, in relevant part, that "upon the application of the parent ... of a child temporarily removed under this part ... the court shall hold a hearing to determine whether the child should be returned .... Upon such hearing, the court shall grant the application, unless it finds that the return presents an imminent risk to the child's life or health."

Prior to the December 12 Hearing, Blue conducted a further investigation and "it was concluded by ACS that there was no doubt that Mrs. Brown had left the children alone and unsupervised for several hours on December 6, 1997. Nevertheless, Mrs. Brown had properly cared for her children. Accordingly, the parties entered into settlement negotiations .... [and] on Friday, December 12, 1997, the [Family] Court entered an Order reflecting the agreement of the parties. The [biological] children were returned ... on December 15, 1997 [and] after the year long supervision [provided for in the settlement agree-

ment between ACS and Brown presented orally to Judge Schechter on December 12, 1997], which determined that [*12] the children were properly cared for, their case was closed on February 27, 1998." Blue Aff. P 12; Defs' 56.1 Stmt PP 68-75; Pls' 56.1 Stmt PP 68-75; see Transcript of Family Court Proceeding held December 12, 1997, Exhibit 18 to Weddle Dec., at 3 (Special Assistant Corporation Counsel Lisa Badner [for ACS]: "A.C.S. has decided to parole the ... children ... to the ... mother under certain terms and conditions, namely that [Brown] comply with random drug tests, Court ordered supervision by A.C.S. and that any babysitter hired be explored by A.C.S. and approved by A.C.S." Mr. Goldstein [for Brown]: "This is in consent with the mother."); Order, dated December 12, 1997, signed by Judge Schechter, Exhibit C to Blue Aff. ("December 12, 1997 Order"), at 1 ("On consent of all parties, this case is adjourned in contemplation of dismissal under the following terms and conditions: (1) [Brown] cooperate with ACS supervision for 12 months; ... (2) [Brown] shall provide names of all babysitters and ACS must then approve of the babysitters before they are hired or used.").

### III. Legal Standard

Summary judgment may not be granted unless "the pleadings, depositions, answers [*13] to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Nan Sung Park v. City of New York, 2003 U.S. Dist. LEXIS 578, No. 99 Civ. 2981, 2003 WL 133232, at *6 (S.D.N.Y. Jan. 16, 2003). "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them." Siederbaum v. City of New York, 309 F. Supp. 2d 618, 620 (S.D.N.Y. 2004) (citing Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).

"The party seeking summary judgment bears the initial burden of showing that no genuine issue of material fact exists." Taylor v. Evans, 72 F. Supp. 2d 298, 304 (S.D.N.Y. 1999); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The burden then shifts to the nonmoving party which must set forth specific facts showing that there is a genuine [*14] issue for trial. Taylor, 72 F. Supp. 2d at 305; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). "A court faced with a motion for summary judgment must view the evidence in

the light most favorable to, and draw all reasonable inferences in favor of, the non-moving party." Nan Sung Park, 2003 U.S. Dist. LEXIS 578, 2003 WL 133232, at *6. "Summary judgment is warranted only if 'the evidence is such that a reasonable jury could not return a verdict for the nonmoving party.'" McSween v. Edwards, 91 F. Supp. 2d 513, 520 (E.D.N.Y. 2000) (quoting Anderson, 477 U.S. at 248).

"The Rooker-Feldman doctrine holds that inferior federal courts lack subject matter jurisdiction 'over cases that effectively seek review of judgments of state courts and that federal review, if any, can occur only by way of a certiorari petition to the Supreme Court.'" Phifer v. City of New York, 289 F.3d 49, 55 (2d Cir. 2002) (quoting Moccio v. New York State Office of Court Admin., 95 F.3d 195, 197 (2d Cir. 1996)). [*15]

"There are two ways government officials can show they are entitled to qualified immunity arising from their discretionary actions. First, they are immune from liability if their conduct does not violate 'clearly established' statutory or constitutional rights the existence of which a reasonable person would have known .... Second, government officials will be immune if they can establish that it was objectively reasonable for them to believe their actions were lawful at the time." Moore v. Vega, 371 F.3d 110, 114 (2d Cir. 2004). "A defendant is entitled to qualified immunity even if officials 'of reasonable competence could disagree' that the acts in question were objectively reasonable." Taylor, 72 F. Supp. 2d at 309 (quoting Malley v. Briggs, 475 U.S. 335, 341, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986)). "A defendant is entitled to summary judgment on qualified immunity grounds when no reasonable jury ... could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not violate an established federally protected right." Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995). [*16] If the official's actions were objectively reasonable under prong two of the test, it is not necessary to evaluate prong one. See Doe v. Marsh, 105 F.3d 106, 110 (2d Cir. 1997).

"Official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." Hafer v. Melo, 502 U.S. 21, 25, 116 L. Ed. 2d 301, 112 S. Ct. 358 (1991) (citations omitted). "In order for a court to impose liability on a municipal defendant under § 1983, the plaintiff must establish a municipal 'policy' or 'custom' from which the alleged injury arose." Tenenbaum v. Williams, 193 F.3d 581, 597 (2d Cir. 1999) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978)).

"The existence of probable cause to arrest constitutes justification and is a complete defense to an action

for false arrest, whether that action is brought under state law or under [federal law]." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted). "Probable cause is established when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable [*17] caution in the belief that an offense has been committed by the person to be arrested." *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (citation omitted); *see Calamia v. City of New York*, 879 F.2d 1025, 1032 (2d Cir. 1989) ("The existence of probable cause must be determined on the basis of a totality of the circumstances."); *Ba v. N.Y. City Police Dep't*, 2001 U.S. Dist. LEXIS 14568, No. 99 Civ. 11984 (GEL), 2001 WL 1098019, at *6 (S.D.N.Y. Sept. 19, 2001) ("Where an officer acts ... in reasonable and good faith reliance on information provided by a credible witness at the scene, [he] has complied with the requirements of the [Constitution]."); *Velaire v. City of Schenectady*, 862 F. Supp. 774, 780 (N.D.N.Y. 1994) ("[A] police officer's judgment as to probable cause ... may be based on hearsay evidence, upon suspicious circumstances and upon probabilities.... Police could reasonably ... rely on the eyewitness account of a [witness]....").

"To establish a claim for malicious prosecution ... the plaintiff must show (1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable [*18] cause to believe the proceeding could proceed, (3) that the defendant acted with malice, and (4) that the prosecution was terminated in the plaintiff's favor." *Posr v. Court Officer Shield 207*, 180 F.3d 409, 417 (2d Cir. 1999). "Probable cause is a bar to claims of malicious prosecution directed at the arresting officer under § 1983 or [New York] state law, unless that officer, following the arrest but prior to initiating prosecution, learned of facts that would negate his earlier determination of probable cause." *Moscoso v. City of New York*, 92 F. Supp. 2d 310, 313 (S.D.N.Y. 2000) (quoting *Dukes v. City of New York*, 879 F. Supp. 335, 341-42 (S.D.N.Y. 1995)).

## IV. Analysis

### A. *Rooker-Feldman*

Defendants argue that "this Court lacks subject matter jurisdiction under the *Rooker-Feldman* doctrine, of all plaintiffs' claims insofar as they require this Court to review the Family Court determinations regarding the removal of Ms. Brown's children" including the December 9, 1997 Family Court proceeding during which Family Court Judge Schechter determined that it was necessary and appropriate to remove the children [*19] from their mother's custody. Defs' Memo at 2. "The *Rooker-Feldman* doctrine divests this Court of jurisdiction over

plaintiff's wrongful removal claim and mandates that the City defendants be granted summary judgment on all of these claims," Defs' Memo at 20, *i.e.* Plaintiffs' claims of wrongful removal and malicious prosecution in Family Court. [6] Plaintiffs respond that *Rooker-Feldman* does not apply here because "Brown had no opportunity to litigate the issue of custody on December 9, 1997." Pls' Memo at 23.

> 6    Defendants do not raise *Rooker-Feldman* in regard to Plaintiffs' federal and state claims of false arrest and malicious prosecution in Criminal Court.

Judge Schechter found, on December 9, 1997, that the temporary removal of Brown's children was appropriate and justified. *See* December 9, 1997 Order at 1-2 ("It appearing that: (a) Said children's interests do require protection pending a final order of disposition and that continuation in the children's home would be contrary to the best [*20] interests of the children and that temporary removal of said children from their place of residence is necessary to avoid imminent risk to said children's life or health in that: (b) Imminent risk to the children would be eliminated by the issuance of an order of protection directing the removal ... from the children's residence; and (c) reasonable efforts were made prior to the date of the hearing herein to prevent or eliminate the need for removal for the home ...; and (d) reasonable efforts were made to make it possible to return the child; and (e) the respondent was present at the hearing of this application; and ... (g) removal is necessary because imminent risk - see allegations in petition ... it is ... ORDERED that said children be placed in the custody of ACS pending further proceeding herein ... "); *Nan Sung Park*, 2003 U.S. Dist. LEXIS 578, 2003 WL 133232, at *10-11 ("For ACS caseworkers to lack a reasonable basis for removal, and for the Plaintiffs' substantive due process claim to succeed, the state court must have wrongly decided to these issues of removal and neglect .... In the present case, the Family Court affirmed the removal of the children based on the imminent danger to [the children]. [*21] *Rooker-Feldman* bars relitigation of this issue in federal court."). Judge Schechter's December 9, 1997 Order was based on the Petition filed on December 9, 1997 by Blue on behalf of ACS and the preliminary hearing held on that same day. *See* December 9, 1997 Order at 1; *Yuan v. Rivera*, 48 F. Supp. 2d 335, 341 (S.D.N.Y. 1999) ("On the day the petition was filed, [the] Family Court Judge ... held a preliminary hearing at which [the mother was] present. Based on the allegations in the petition, [the Family Court] Judge remanded both [of the children] to [ACS] custody.").

Brown had an opportunity to litigate at the December 9 proceeding. *See Phifer*, 289 F.3d at 57 ("This court

may not review the family court's determinations regarding custody, neglect, and visitation, as those issues were decided by the family court after providing [Plaintiff] a full and fair opportunity to litigate those issues."); *Nan Sung Park,* 2003 U.S. Dist. LEXIS 578, 2003 WL 133232, at *10 ("The basis for removal was 'actually and necessarily decided' by the family court and the Plaintiff[] has not raised a genuine issue of fact questioning [her] opportunity to litigate the [*22] issues fully and fairly in the family court proceedings (during which [she was] represented by counsel) ..."). She appeared in Family Court along with her attorney and exercised her right to request a hearing to determine whether the children should be returned to her pursuant to New York Family Court Act § 1028 ("1028 Hearing"), which Judge Schechter, in fact, scheduled for December 12, 1997. *See* Transcript of Family Court Proceeding held December 9, 1997 at 4, Exhibit 11 to Weddle Dec. ("Mr. Goldstein: She still wishes to have a 1028 hearing .... The Court: December 12."). Whether the December 9, 1997 proceeding in (busy) Family Court was short in duration is beside the point - due process was clearly afforded the Plaintiff pursuant to the Family Court Act. And, that a 1028 Hearing was never held was attributable to Ms. Brown's decision to accept the settlement/resolution on December 12, 1997. *See Allianz Ins. Co. v. Cavagnuolo,* 2004 U.S. Dist. LEXIS 8186, No. 03 Civ. 1636, 2004 WL 1048243, at *6 (S.D.N.Y. May 7, 2004) ("A settlement agreement may constitute a final judgment for purposes of the *Rooker-Feldman* doctrine."). Although Plaintiffs elected not [*23] to appeal, an appeal of the Family Court's determinations could have been made to the New York State Appellate Division, First Department. *See* Family Court Act § 1111 ("An appeal may be taken to the appellate division of the supreme court of the judicial department in which the family court whose order is appealed from is located."); Family Court Act § 1112 ("An appeal from an intermediate or final order or decision in a case involving ... neglect may be taken as of right to the appellate division ... and shall have preference over all other matters."); *Thaler v. Casella,* 960 F. Supp. 691, 697-98 (S.D.N.Y. 1997) (*Rooker-Feldman* "holds that a district court lacks subject matter jurisdiction to entertain a federal suit attacking a state court judgment against a particular individual ... [and] requires that an aggrieved state court litigant must pursue [her] claims directly in the state appellate courts and ultimately to the United States Supreme Court."); *Thomas v. Beth Israel Hosp. Inc.,* 710 F. Supp. 935, 940 (S.D.N.Y. 1989) (Plaintiff "has not pursued several state court remedies .... Pursuant to § 1112 of the Family Court Act, [Plaintiff] [*24] had the right to appeal from the Family Court order remanding [the children] to [ACS] custody.").

The Court concludes that it does not have subject matter jurisdiction to review the Family Court's disposition, including the December 9, 1997 Order approving the removal of children from Brown's custody, under *Rooker-Feldman,* or Plaintiffs' claim of malicious prosecution in family court. *See Richards v. City of New York,* 2003 U.S. Dist. LEXIS 8037, 97 Civ. 7990 (MBM), 2003 WL 21036365, at *10-11 (S.D.N.Y. May 7, 2003) ("If the Family Court in this case decided that defendants had a reasonable ground to separate [Plaintiff] from the children, the Court actually and necessarily decided the issue presented in this § 1983 action .... determining whether the children in this action were wrongfully removed from [Plaintiff's] custody would require this court to reexamine the Family Court's finding that the children had been [neglected]."); *Saint-Fleur v. City of New York,* 2000 U.S. Dist. LEXIS 8814, No. 99 Civ. 10433, 2000 WL 280328, *6 (S.D.N.Y. Mar. 14, 2000) ("To the extent [Plaintiffs'] complaint [including a claim of malicious prosecution in Family Court] appears to be collaterally attacking [*25] the judgment of the Family Court, the action ... is barred by the *Rooker-Feldman* doctrine."); *Stein v. City of New York,* 24 Fed. Appx. 68, 69 (2d Cir. 2001) (Plaintiff "was not denied any opportunity to be heard; in fact [Plaintiff] was a party to and participated in the Family Court proceedings that resulted in the ... order placing [her] children with the Commissioner for Social Services.").

## B. *Qualified Immunity of Individual Defendants*

Defendants argue that all of "the individual defendants are protected by qualified immunity since they could reasonably have believed their conduct was lawful." Defs' Memo at 2. Plaintiffs respond that "qualified immunity cannot be applied when an official acts in a manner which he or she knew or reasonably should have known would violate the clearly established constitutional rights of another." Pls' Memo at 18. [7]

> 7   The issue of the ACS Defendants' qualified immunity defense is moot because of the Court's determination that the claims against them are dismissed under *Rooker-Feldman. See Rivera v. Goord,* 253 F. Supp. 2d 735, 757 (S.D.N.Y. 2003) (following grant of summary judgment, the Court does "not address the issue of defendants' qualified immunity as the issue is moot ..."); *Nigro v. Phillips,* 1997 U.S. Dist. LEXIS 2143, No. 92 Civ. 399, 1997 WL 86323, at *16 (N.D.N.Y. Feb. 28, 1997) ("The court's earlier determination that [ACS] defendants are entitled to summary judgment ... moots defendants' qualified immunity argument ...").

[*26] The NYPD Defendants are entitled to qualified immunity with respect to the claims against them for false arrest and malicious prosecution in Criminal Court, because, drawing all inferences in Plaintiffs' favor, no rational jury would find that it was not objectively reasonable for them to believe that probable cause existed at the time of Brown's arrest that she had committed the crime of endangering the welfare of her children. *See Cerrone v. Brown,* 246 F.3d 194, 202-03 ("To be entitled to qualified immunity, [officers] need only have possessed 'arguable' probable cause to [arrest Plaintiff], not actual probable cause."). That is, based, *inter alia,* upon the police investigation, which included, among other things, review of Brown's work records, an interview with Brown in which she "admitted ... that she leaves the children alone every day for about 15 minutes when she goes to work and that on December 6, 1997 the children had been left alone for several hours," Fox Aff. P 10, Grier's statements that, among other things, "'this was not the first time the children had been left alone ... Brown would leave for work approximately at 5:30 a.m. and Ms. Grier [*27] would arrive ... at approximately 7:30 a.m," Matias Aff. P 13, and the EMS examination of the children which concluded that "Barry ... was congested .... Brandy ... was congested and had been coughing .... Ruben ... had stomach pains ... [and] Brandy had thrown up," Matias Dec. P 9, no reasonable jury could conclude that it was objectively unreasonable for the Defendants to believe that probable cause existed to arrest Brown on December 6, 1997. Defendants' reasonable belief was also based on Matias' personal observations of the condition of Plaintiffs' apartment on December 6, 1997, *i.e.* "that the ... home was in total disarray .... I also noticed four children were left alone ... I also smelled urine and noticed pillows on the floor with urine on them." Matias Aff. 5-6; Defs' 56.1 Stmt PP 16-19. *See Rogers v. City of Amsterdam,* 303 F.3d 155, 159 (2d Cir. 2002) ("Given these conditions, officers of reasonable competence could disagree as to whether probable cause existed to arrest ... "); *Whitton v. Williams,* 90 F. Supp. 2d 420, 429 (S.D.N.Y. 2000) ("It can be objectively reasonable for an officer to believe that probable cause existed for the [*28] arrest, even in the absence of a finding that probable cause in fact existed." (citation omitted)).

## C. *Plaintiffs' (Remaining) Constitutional Claims*

With respect to Plaintiffs' claims against the City (and the NYPD Defendants in their official capacities) for the allegedly "false arrest ... of plaintiff under the Fourth Amendment to the United States Constitution ... [and] New York State Law, ... [and] malicious prosecution of plaintiff in the New York Criminal Court in violation of the Fourth and Fourteenth Amendments to the United States Constitution ... [and] New York State

Law," Pls' Memo at 1, Defendants argue that "the circumstances surrounding the children's removal provided probable cause for Brown's arrest and prosecution on the charge of endangering her children's welfare ..." require the dismissal of Plaintiffs' federal and state claims. Def's Memo at 2. Plaintiffs respond that "Defendants lacked probable cause for several reasons: First, it was unreasonable for defendants to rely on Helena Grier's statements. Second, defendants lacked sufficient evidence to believe that anyone had committed the crime of Endangering the Welfare of a Child. Finally, defendants [*29] failed to properly investigate the readily available circumstances surrounding the alleged crime." Pl's Memo at 6. In support of their criminal malicious prosecution claim, Plaintiffs also argue that Defendants "obtained a wealth of information after the commencement of the criminal prosecution which demonstrated that Ms. Brown was innocent of wrongdoing. Despite that knowledge, they continued to prosecute her for more than two years." Pls' Memo at 12.

The Court's finding of probable cause acts as a defense to Plaintiffs' false arrest claim under both federal and state law. *See Weyant,* 101 F.3d at 852 ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under [federal law]."); *Ba,* 2001 U.S. Dist. LEXIS 14568, 2001 WL 1098019, at *6 ("Where an officer acts ... in reasonable and good faith reliance on information provided by a credible witness at the scene, [he] has complied with the requirements of the [Constitution]."); *Ricciuti v. New York City Transit Authority,* 124 F.3d 123, 128 (2d Cir. 1997) ("Once a police officer has a reasonable [*30] basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.").

The Court's finding of probable cause to arrest may also (ultimately) impact Plaintiffs' malicious criminal prosecution claim under both federal and state law, although, at this time, material issues of fact are raised as to whether (and when) Defendants may have learned of circumstances warranting discontinuance of the criminal case earlier than July 28, 2000. *See Fox v. City of New York,* 2004 U.S. Dist. LEXIS 6844, No. 03 Civ. 2268, 2004 WL 856299, at *6 (S.D.N.Y. Apr. 4, 2004) ("One of the essential elements of a malicious prosecution claim is a showing that there was a lack of probable cause to initiate the prosecution .... [Plaintiff] has not alleged that any new facts had surfaced between the time of [her] arrest and the initiation of prosecution against [her] which might vitiate a finding of probable cause."); *Moscoso,* 92 F. Supp. 2d at 313 ("Probable cause is a bar to claims of malicious prosecution directed at the arresting officer under § 1983 or [New York] state law, unless

that officer, following [*31] the arrest but prior to initiating prosecution, learned of facts that would negate his earlier determination of probable cause."); *see also Bernard v. United States,* 25 F.3d 98, 104 (2d Cir. 1994) (When prosecution commenced, "control of the prosecution ... and was no longer within the [officer]'s authority.").

After the commencement of prosecution, "the police may not purposely withhold or ignore exculpatory evidence that, if taken into account, would void probable cause." *Richards,* 2003 U.S. Dist. LEXIS 8037, 2003 WL 21036365, at *16. "A malicious prosecution claim can rest on a prosecution that is continued notwithstanding the discovery of information that exculpates the defendant: 'Under New York law, even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause. In order for probable cause to dissipate, the groundless nature of the charge must be made apparent by the discovery of some intervening fact.'" *Kinzer v. Jackson,* 316 F.3d 139, 143-44 (2d Cir. 2003) (quoting *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 571 (2d Cir. 1996).

In December 1997, ACS concluded that "there [*32] was no doubt that Mrs. Brown had left the children alone and unsupervised for December 6, 1997," and determined that a year of ACS supervision was necessary. It also concluded that "Mrs Brown had otherwise properly cared for her children." Blue Aff. P 12; *see also* Deposition of Sheila Blue, dated February 21, 2002 ("Blue Dep"), at 19:18-22, Exhibit 9 to Weddle Dec. ("We offered her [the settlement in Family Court] because our research concluded that she was a decent mother. Nevertheless she admitted to leaving those children in the house. So that had to be addressed."); *see also* December 12, 1997 Order at 1; *Carson v. Lewis,* 35 F. Supp. 2d 250, 263 (E.D.N.Y. 1999); *Dukes,* 879 F. Supp. at 342 ("A finding of probable cause supporting an arrest defeats a malicious prosecution claim unless plaintiff can demonstrate that at some point subsequent to the arrest, additional facts came to life that negated probable cause.").

### D. *Policy and Practice Claim*

Plaintiffs argue that "all of the individual defendants have stated that their actions were consistent with the policies and procedures of their agencies .... Because of the unconstitutional actions [*33] of the individual defendants, there is sufficient evidence of unconstitutional policies and practices ...." Pls' Memo at 11. Defendants argue that "in the absence of any violation of plaintiffs' civil rights, there cannot be a 'policy and practice' claim against the municipal defendants here ...." Defs' Memo at 21.

Municipalities and policy makers may be sued "under § 1983 where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision directly adopted and promulgated by that body's officers .... It is when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983 .... [That policy or custom must be] the moving force of the constitutional violation found by the District Court." *Monnell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 695, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978); *see Covington v. City of New York,* 916 F. Supp. 282, 288 (S.D.N.Y. 1996). Plaintiff has (somewhat generally) alleged that Defendants' actions were taken pursuant to the policies and procedures of the NYPD and that the City and [then Commissioner [*34] Howard] Safir, in his official capacity, are liable. [8] *See* Complaint P 12 ("As Commissioner, Safir made and/or approved those policies that govern the New York Police Department, including policies regarding the arrest and detention of arrestees."); *see also* Deposition of Vicente Matias, dated August 28, 2001, 75:14:18 ("Q: Is everything you did in connection with this case in keeping with the policies and procedures of the New York City Police Department, as you understood them to be? A: Yes, I did."). *See Johnson v. City of New York,* 2003 U.S. Dist. LEXIS 5670, No. 99 Civ. 0048, 2003 WL 1826122, at *11 (S.D.N.Y. April 8, 2003)("Whether there is a relevant policy or custom, or lack thereof, and whether such policy, custom or lack thereof caused Plaintiffs' injuries are questions for trial. Accordingly, Defendants' motion for summary judgment on Plaintiffs' cause of action against the City of New York is denied to the extent Plaintiffs' claims relate to [malicious prosecution in Criminal Court].").

8   *See Barry v. New York City Police Dep't,* 2004 U.S. Dist. LEXIS 5951, No. 01 Civ. 10627, 2004 WL 758299, at *9 (S.D.N.Y. Apr. 7, 2004) ("With respect to Commissioner Safir, Section 1983 actions against officials in their official capacity generally represent only another way of pleading an action against an entity of which an officer is an agent."); *Nogue v. City of New York,* 1999 U.S. Dist. LEXIS 13201, No. 98 Civ. 3058, 1999 WL 669231, at *7 n.13 (E.D.N.Y. Aug. 27, 1999) ("To the extent the Police Commissioner is being sued in his official capacity, any claim against him is merely duplicative of the action against the City.").

### [*35] E. *Notice of Claim*

Defendants also argue that "Plaintiffs' [state law] false arrest claims ... are barred by Plaintiffs' failure to comply with General Municipal Law §§ 50-e [requiring

Plaintiffs to file a notice of claim with the City within ninety days of when the claim arises] and 50-i [requiring Plaintiffs to commence their action within one year and ninety days of when the claim arises]." Defs' Memo at 22. Plaintiffs do not address this issue.

"No action ... shall be prosecuted or maintained against a city ... for personal injury ... alleged to have been sustained by reason of negligence or wrongful act of such city ... or of any officer, agent or employee thereof ... unless ... a notice of claim shall have been served upon the city ... in compliance with section fifty-e of [the New York General Municipal Law." N.Y. Gen. Mun. Law § 50-i. Section 50-e provides that the notice of claim be filed "within ninety days after the claim arises." N.Y. Gen. Mun. Law § 50-e. "A cause of action for false arrest ... accrues at the time the plaintiff is detained ... [and] [a] cause of action for malicious prosecution accrues [*36] when the action is terminated in favor of the plaintiff." *Brogdon v. City of New Rochelle,* 200 F. Supp. 2d 411, 428 (S.D.N.Y. 2002).

Plaintiffs' false arrest claim under state law is subject to dismissal because of Plaintiffs failure to file a timely notice of claim. Plaintiffs' false arrest claim accrued on December 6, 1997, the day of Brown's arrest, *see* Defs' 56.1 Stmt P 57. Because Plaintiffs did not file a notice of claim with the City until October 2, 2000, approximately two years and ten months after Brown's arrest and thirty-one months past the statutory deadline, the claim is barred. *See Brogdon,* 200 F. Supp. 2d at 418 (dismissing plaintiff's state law false arrest claim with prejudice for failure to file a timely notice of claim). [9]

9   Plaintiffs' state false arrest claim also appears untimely under New York General Municipal Law § 50-i because the action was required to be "commenced within one year and ninety days after the happening of the event upon which the claim is based." N.Y. Gen. Mun. Law § 50-i, and was, in fact, commenced on December 5, 2000, more than one year and 90 days after the claims accrued, *see* Complaint, i.e. almost three years after Brown's arrest. *See* Defs' 56.1 Stmt P 57; Blue Aff. P 12.

Plaintiffs' state law claim for malicious prosecution in Criminal Court is not barred because it accrued, at the latest, on July 28, 2000, the day the Criminal Court proceedings were terminated. *See* Pls' 56.1 Stmt PP 150-51; *Brogdon,* 200 F. Supp. 2d at 428 ("A cause of action for malicious prosecution accrues when the action is terminated in favor of the plaintiff."). Plaintiffs filed a notice of claim with the City on October 2, 2000, i.e. approximately two months after the claim arose, and the instant action was

commenced on December 5, 2000, approximately four months after the claim arose. *See* Complaint; N.Y. Gen. Mun. Law § 50-e (A notice of claim against the City and its officers must be served on the City "within ninety days after the claim arises."); N.Y. Gen. Mun. Law § 50-i (Actions against the City and its officers must be "commenced within one year and ninety days after the happening of the event upon which the claim is based.").

[*37] **V. Conclusion and Order**

For the reasons set forth herein, Defendants' Motion [38] is granted in part and denied in part. The parties and counsel are directed to appear at a status/settlement conference with the Court on October 15, 2004 at 2:00 P.M., in Courtroom 706 of the Thurgood Marshall Courthouse, 40 Centre Street, New York, New York 10007. **The Court directs the parties to engage in good faith settlement negotiations prior to the conference with the Court.**

Dated: New York, New York

September 29, 2004

**RICHARD M. BERMAN, U.S.D.J.**

## DECLARATION OF SERVICE

I, Anna Nguyen declare, pursuant to 28 U.S.C. § 1746, under the penalty of perjury that on **November 21, 2007** I served the annexed **Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Complaint Pursuant to Fed. R. Civ. P. 12(b)(6)** upon the following individual by depositing a copy of the same, enclosed in a first class postpaid properly addressed wrapper, in a post office/official depository under the exclusive care and custody of the United States Postal Service, within the State of New York, directed to the said plaintiff pro se at the address set forth herein, being the address designated by said plaintiff for that purpose, to wit:

> Freddy Colon Rodriguez
> Plaintiff Pro Se
> 918 Dumont St., Apt. 1-F
> Brooklyn, NY 11207

Dated:      New York, NY
            November 21, 2007

_____
Anna Nguyen
Assistant Corporation Counsel
Special Federal Litigation